## UNITED STATES v. LECHE et al.
### Cr. No. 9430.

District Court, W. D. Louisiana, Alexandria Division.

March 15, 1940.

Harvey G. Fields, U. S. Atty., and Malcolm E. Lafargue, Asst. U. S. Atty., both of Shreveport, La., for plaintiff.

St. Clair Adams & Son, of New Orleans, La., John R. Hunter, Sr., of Alexandria, La., and J. B. Thornhill, of Monroe, La., for defendants.

DAWKINS, District Judge.

The defendants, Richard W. Leche, L. P. Abernathy and George B. Younger were indicted for using the mails in furtherance of a scheme to defraud. All defendants demurred to the indictment on the ground that it failed to charge a crime against them and was duplicitous. They also asked for a bill of particulars as to certain matters charged.

The bill charges that "before the dates of committing of the offenses hereinafter mentioned" the defendants had formed a scheme to defraud the Louisiana Highway Commission, the State of Louisiana, and its citizens and taxpayers; that at the time of the formation of the said scheme, the defendant, Leche, was Governor of the State, Abernathy was Chairman of the State Highway Commission, and Younger was in charge of or connected with the Younger Motor Truck Company, Inc. of Alexandria, Louisiana; that the scheme was that "the defendants would and did sell to and purchase through the Younger Motor Truck Company, Inc. * * * for the * * * Highway Commission and State * * * motor trucks manufactured by the International Harvester Company, and equipment for said trucks at prices which the defendants then and there well knew were approximately 10% above and greater than the prevailing list or retail market prices. * * * so as to realize from said sales and purchases for said defendants unusually large and unearned profits from the said Highway Commission and the State of Louisiana * * *." That the defendants knew said International Harvester Company had, in its contracts with dealers, reserved to itself the right exclusively "to make sales * * * to States and departments thereof * * *", and on which no dealers' commissions would be charged and in addition such purchasers would be allowed further discounts from lists or retail market prices; that the defendants "would and did thus cause the said Louisiana Highway Commission and the State of Louisiana to send and pay to the Younger Motor Truck Company, Inc. * * * in October, 1937 and September, 1938, for two purchases of a total of two hundred and thirty-three (233) * * * trucks and equipment therefor, a total of three hundred and ninety-seven thousand, three hundred and thirty-two and fifty-nine one hundreds ($397,332.59) dollars, of which sum approximately two hundred and sixty-eight thousand, sixty-nine and fifty-nine one hundreds ($268,069.59) dollars was the cost of said two hundred and thirty-three (233) trucks and equipment * * * seventeen thousand, eight hundred and ninety-one and ninety one hundreds ($17,891.90) dollars was for freight and taxes charged on the purchases, and approximately one hundred and eleven thousand, three hundred and seventy and fifty-six hundreds ($111,370.56) dollars, which was about forty-one per cent (41%) of the cost of the trucks and equipment, was also distributed by the Younger Motor Truck Company, Inc., George Younger and one James Thomas, as profits on the two sales made to the Louisiana Highway Commission and the State of Louisiana for the use and benefits of the defendants; and that the said defendants would and thus did fraudulently obtain from the said Highway Commission, the State of Louisiana and the taxpayers" the said amount "above and over what the Louisiana Highway Commission and the State of Louisiana could have purchased the aforesaid motor trucks and equipment * * * from the manufacturers" or for "only approximately fifty-nine per cent (59%) of the money paid to the said defendants."

I quote from the indictment further as follows:

"A further part of the scheme was that said defendants would and did on or about August 1, 1937, enter into an agreement to sell to and purchase for the Louisiana Highway Commission and the State of Louisiana 138 motor trucks manufactured by the International Harvester Company, and equipment therefor manufactured by the International Harvester Company, Braden Winch Manufacturing Company, and Nabors Trailer Company, et al, all of which motor trucks and equipment were invoiced and billed to the Louisiana Highway Commission under date of October 5, 1937, at a price substantially in excess of the prevailing list or retail market price of said motor trucks and equipment, and for a total sum of Two Hundred Twenty-Seven Thousand, One Hundred Seventy-Three and 54/100 Dollars ($227,173.54), all of which was paid by checks of the Louisiana Highway Commission Nos. 4331, 4332, 4333, which were issued and caused to be issued by the said defendants on October 13, 1937, for the total sum of

$227,173.54, of which sum $157,864.01 represented the actual cost to the said defendants of the said motor trucks and equipment, $11,378.47 represented the freight and tax on the said motor trucks and equipment, and $57,931.06 represented profit distributed through the Younger Motor Truck Company, George Younger and James Thomas for the use and benefit of said defendants; and that the Louisiana Highway Commission, the State of Louisiana, and its taxpayers would be and were defrauded out of the said profit of $57,931.06 to said defendants, because, as the said defendants well knew, the said Louisiana Highway Commission could and would have purchased the said motor trucks and equipment from the manufacturers thereof at approximately $57,931.06 less than paid by the Louisiana Highway Commission under date of October 13, 1937, to the Younger Motor Truck Company, Inc. at Alexandria, Louisiana, for the said defendants.

"A further part of the scheme was that the said defendants would and did on or about July 25, 1938, enter into an agreement to sell to and purchase for the Louisiana Highway Commission and the State of Louisiana 95 motor trucks manufactured by the International Harvester Company and equipment therefor manufactured by the Hercules Steel Products Company and the Nabors Trailer Company, all of which motor trucks and equipment were invoiced and billed to the Louisiana Highway Commission under date of September 15, 1938, at a price substantially in excess of the prevailing list or retail market price of said motor trucks and equipment, and for a total sum of $170,158.51, all of which was paid by warrant of the Louisiana Highway Commission No. 1529, which was issued and caused to be issued by the said defendants on September 16, 1938, for the total sum of $170,158.51, of which sum $110,205.58 represented the actual cost to the said defendants of the said motor trucks and equipment, $6,513.43 represented the freight and tax on the said motor trucks and equipment, and $53,439.50 represented profit distributed through the Younger Motor Truck Company, George Younger, and James Thomas for use and benefit of the said defendants; and that the Louisiana Highway Commission, the State of Louisiana, and its taxpayers would be and were defrauded out of the said profit of $53,439.50 to said defendants, because as the said defendants well knew, the said Louisiana Highway Commission could and would have purchased the said motor trucks and equipment from the manufacturers thereof at approximately the same price paid for them by the said defendants, and for approximately $53,439.50 less than paid by the Louisiana Highway Commission under date of September 16, 1938, to the Younger Motor Truck Company, at Alexandria, Louisiana, for the said defendants."

That as a further part of the said scheme, the defendants did fail and refuse to comply with the laws of the State which required the advertising for bids in all purchases in excess of $500 "to be paid out of public funds and to award the business to the lowest bidder, because they, the defendants, knew that bids would be submitted in response thereto, which would make it impossible for them to obtain the said profit of $111,370.56, which was distributed as follows, to-wit:

"To Younger Motor Truck Company ...................... $56,953.44
To James Thomas............ 54,417.12

The said James Thomas subsequently distributed the sum received by him, namely, $54,417.12 in part as follows, to-wit:

To Richard W. Leche........ $31,000.00."

Further, that "among the many material false and fraudulent pretenses, representations and promises made by the said defendants, for the purpose of inducing the said Commission and State, and persons to be defrauded to pay the funds amounting to $111,370.56 * * * and for defrauding the said Commission" were that "on or about October 5th, 1937" the Commission "was indebted to the Younger Motor Truck Company, Inc. * * * in the sum of $227,173.54 for one hundred and thirty-eight (138) motor trucks and equipment * * * delivered to the * * * Commission by the said defendants through the said Younger Motor Truck Company, Inc.; whereas, in truth and in fact, as the said defendants well knew" the said trucks and equipment had been purchased by the said defendants at approximately "$169,242.48, including freight and taxes, and which sum was all that was due by the Louisiana Highway Commission * * *."

Further, that on or about September 15th, 1938, they did represent that the Commission was indebted to said Younger Motor Truck Company, Inc., in the sum of $170,158.51 "for ninety-five (95) trucks * *, * whereas in truth and in fact", they had cost only $116,719.01 "including freight and taxes" and was all that was due therefor by said Commission.

Further quotations from the indictment are as follows: "And your Grand Jurors, aforesaid, say present and find that each and every one of the pretenses, representations and claims made and intended to be made for the said defendants were false and untrue and intended to be false and untrue, and at all times mentioned herein were known by the said defendants to be false and untrue and were made and intended to be made by the defendants for the purpose and with the intention of obtaining from the Louisiana Highway Commission, the State of Louisiana, its taxpayers and citizens, sums of money not lawfully. due and converting the same to the use and benefit of the said defendants, in violation of their official trusts, sworn obligations and duties, and under the cloak of bribery and deception."

The bill further charges that on or about October 14th, 1937, "for the purpose of executing said scheme" the defendants "did * * * cause to be delivered" through the mails "to the Bank to which the same then and there was addressed, to-wit, the Guaranty Bank and Trust Company, Alexandria, Louisiana, a certain letter under Regristry No. 34135, voucher checks contained in an envelope, bearing the required amount of postage thereon * * * said letter being of the following tenor, to-wit:

"'October 13, 1937

"'Guaranty Bank and Trust Company
"'Alexandria, Louisiana

"'Gentlemen:
"'As requested by Mr. George Younger, President, Younger Motor Truck Company, Inc., we are enclosing herewith the following vouchers:

| Voucher # | Check # | Amount |
|---|---|---|
| 55–10 | 4031 | 9,042.30 |
| 56–10 | 4032 | 165,330.89 |
| 57–10 | 4033 | 52,800.25 |

"'You will note that Mr. Younger receipted these vouchers and endorsed the same payable to your order which we understand is in accordance with his agreement with your bank.

"'We are mailing copy of this letter to Mr. Younger for his files.

"'Very truly yours,
"'Louisiana Highway Commission
"'By:
"'P. J. Becker
"'Auditor
"'RB:1c.
"'encl.
"'cc—Mr. George Younger'"

This count of the indictment also copied in full in the three vouchers, each of which on its face is termed a "Voucher" and purports to have been issued at Baton Rouge, Louisiana, on October 13th, 1937, payable to the Younger Motor Truck Company, Inc., drawn on the American Bank & Trust Company of New Orleans, Louisiana, signed by the Louisiana Highway Commission through L. P. Abernathy, Chairman, and E. D. Granelloni, Vice-Chairman, and bearing the legend "Purchase Equipment Account."

Count two charges that in pursuance of the scheme and for the purpose of executing it, as described in the first count, the defendants, on or about September 20th, 1938, caused to be delivered through the mails to the Rapides Bank & Trust Company at Alexandria, Louisiana, a sight draft on a form of the Louisiana National Bank at Baton Rouge, payable to James Thomas, in the sum of $22,000, signed by the Younger Motor Truck Company, Inc., by George Younger, and drawn on the Guaranty Bank & Trust Company of Alexandria, Louisiana, the said draft being copied in full in the said second count.

The third count charges that on September 21, 1938, the said defendants in further execution of said scheme described in the first count and made part by reference, did cause to be placed in the mails at Alexandria, Louisiana, a draft drawn by the cashier of the Rapides Bank & Trust Company, drawn in favor of the Commerical National Bank of Shreveport, Louisiana, in the sum of $35,026.23, drawn on the Whitney National Bank of New Orleans, Louisiana, and addressed to the Commercial National Bank of Shreveport, Louisiana, the said draft being copied in full in the said third count.

The points made in support of the demurrer, although embraced in several paragraphs, have been reduced in oral argument and brief to substantially three headings:

1. On its face, the indictment shows that the alleged scheme had been consummated before the mails were used and the documents described were mailed for the purpose of distributing the proceeds.

2. As to each and every count, it appears that there were, in reality, two schemes, to-wit, involving first, the transaction covering the sale of the first 138 trucks in October, 1937, and second, the one with respect to the sale and purchase of the 95 trucks in September, 1938.

3. That the defendants are entitled to bills of particulars.

## Opinion.

■ As to the first contention, I think, both from the allegations of the indictment and the terms of the three vouchers covered by count No. 1, it is apparent that, while the amount to be paid had been agreed upon, as represented thereby, the Highway Commission had not and did not part with its money until these vouchers had gone to the Guaranty Bank & Trust Company at Alexandria, through and by the use of the mails at the time and under the circumstances alleged, and until they had thereafter reached the American Bank & Trust Company in New Orleans and been charged against the account of the Commission. In other words, at any time, after the mailing of the letter of the Highway Commission to the Guaranty Bank & Trust Company, dated October 13, 1938, with the enclosed vouchers and before they had reached the American Bank & Trust Company in New Orleans and been charged to the account of the Highway Commission, the latter could have stopped payment thereon, thereby preventing the Younger Motor Company, Inc., from availing itself of the proceeds. It seems clear to me that, so long as the Commission had not parted with its money, any steps taken to that end, such as the drawing, indorsing and mailing to the Guaranty Bank and Trust Company, of the vouchers and their subsequent transmission to the Bank on which they were drawn, were all in furtherance and consummation of the scheme in the sense of law. The cases cited by counsel for the defendants were clearly those in which the funds or property which were the objects of the schemes had come under the control of the parties to it, and the use of the mails in distributing the spoils among the schemers, could not have played any part in causing the persons to be defrauded to part therewith. The circumstances of the present case are quite different to those of any thus cited, in that, here, the persons alleged to have been defrauded were, in reality, the taxpayers of the State, as to whom the defendants, Leche and Abernathy, were not only agents and representatives, but were the persons who possessed the power and authority to and should have prevented the perpetration of the alleged fraud. On the contrary, they are alleged to have been parties to the scheme, and the Governor, at least, is charged to have received a large part of the unlawful profits. Hence, there was no one to speak or act for the victims, the State and its taxpayers. However, notwithstanding this unfortunate situation, these alleged victims were not deprived of their money until in the usual and ordinary course of commercial transactions, it had passed beyond the reach of anyone, who, had he been available and so inclined, could have prevented its being thus expended.

What has been thus said about the vouchers involved in the first count, I think is equally true of the drafts covered by the second and third counts, except that I believe there is some merit in the demand for bills of particulars, as to these counts, which will be considered later.

Defendants contend that because the indictment, in describing the scheme, with respect to the first 138 trucks, says that the total price of $227,173.54 "all of which was paid by checks of the Louisiana Highway Commission, Nos. 4331, 4332, and 4333, which were issued and caused to be issued by the said defendants on October 13, 1937 * * *" and that the amount thus paid was "approximately $57,931.06 less than paid by the Louisiana Highway Commission under date of October 13, 1937, to the Younger Motor Truck Company, Inc. * * *", as well as similar language with respect to the 95 trucks sold in September, 1938, this amounts to an affirmative allegation that the money was paid and the transaction closed as of those dates, and that the subsequent verbiage of the bill simply describes the manner in which the defendants distributed the spoils among themselves.

In the first place, each count must be considered as a whole, including the portion of the first count which delineates the scheme. It will be noted that the language used is that the sum collected by the defendants "was paid by checks * * *

which were issued and caused to be issued by the defendants on October 13, 1937 * * *". In the light of subsequent statements as to how the checks were handled before the sums which they represented were realized by defendants, it would seem reasonable to conclude that the indictment meant to say that the checks or vouchers were issued on October 13, 1937, and were thereafter collected through the mails as later described; and the concluding language of the paragraph, dealing with the first sale of the 138 trucks, that the Commission could have purchased the same for $57,931.06 "less than paid * * * under date of October 13, 1937", must be read in connection with the entire circumstances set out in the bill, and as meaning the vouchers were issued on that date and collected through the mails as charged.

The same reasoning, of course, applies to the sale in September, 1938, of the 95 trucks.

I shall not undertake to analyze the numerous cases cited by counsel for the defendants, for the reason, I believe a mere reading of them will disclose the fundamental differences from the present charge. In fact, many of them would seem to support the conclusion reached here. Barnes v. United States, 8 Cir., 25 F.2d 61, 64; Lemon v. United States, 8 Cir., 164 F. 953; Stewart v. United States, 8 Cir., 300 F. 769; Farmer v. United States, 2 Cir., 223 F. 903; Preeman v. United States, 7 Cir., 244 F. 1. See also Bogy v. United States, 6 Cir., 96 F.2d 734; Smith v. United States, 5 Cir., 61 F.2d 681.

It seems to me that the case nearest in point cited by defendants, is that of United States v. Dale, D.C., 230 F. 750. The portion of the opinion quoted shows that the scheme was to represent to the victim that his father, before death, had ordered a pair of spectacles which were worth $10 to be delivered by express c. o. d.; that this was false and the spectacles sent were actually worth not more than $1; that the accused did not use the mails, but sent the glasses by express, the price to be collected on delivery, but that the express company, in remitting, sent its own check in a letter addressed to the accused through the mail in care of its office in San Francisco, instead of directing that it be paid to him in cash. It was held that this was not of his procurement or according to his intention or contemplation at any time. I quote from the cited case in part as follows: "It is evident from the scheme as alleged that its culmination would consist in inducing Schneider 'to pay to Wells Fargo & Co. the sum of $10, which said sum should be by said Wells Fargo & Co. delivered to defendants.' It is not averred that it was intended that said sum should be sent to defendants by mail, so that from the indictment we may gather that Schneider paid to Wells Fargo & Co. the sum of $10, that Wells Fargo & Co. delivered this sum to defendants, and that they procured a check for that amount and mailed it to themselves at San Francisco, under the name of the Universal Company. If this be the meaning of the indictment, the mailing was in no way in furtherance of a scheme to defraud, although so averred, as the scheme had already been consummated. If this is not the meaning, but it is meant that Wells Fargo & Co., instead of 'delivering the said sum of $10 to defendants,' as it is averred they intended the express company to do, the company, going beyond their intention, mailed the money to them, they cannot be held criminally responsible for such use of the mails by the company, and the mailing of the letter would not be in furtherance of the scheme, which according to the averments of the indictment went no further than the 'payment of the money to Wells Fargo & Co., and its delivery by said company to them.'"

### Duplicity.

Coming now to the more serious attack against the indictment of duplicity, the defendants say that it clearly appears there were two schemes, to-wit, the transaction by which the first 138 trucks were sold in October, 1937, and the other involving the sale of 95 trucks in September, 1938, almost a year later. They claim that not only were the two transactions separate in point of time, by approximately a year, but that the latter one included other persons and matters not involved in the earlier sale. However, I think this contention confuses the scheme with what is alleged to have been done under it. In substance, the first paragraph of count No. 1 (in which the scheme is described, the others making it a part by reference) says: "that before the dates of committing of the offenses hereinafter mentioned" the defendants "did * * * devise and intend to devise a scheme and artifice to defraud * * * the Louisiana Highway Commission, the State of Louisiana, its taxpayers

and citizens * * * which said scheme and artifice * * * were in substance * * * that the defendants would and did sell * * * through Younger Motor Truck Company, Inc. * * * (to) the Louisiana Highway Commission * * * trucks manufactured by International Harvester Company * * * at a price ten per cent above and greater than the prevailing market or retail prices, so as to realize from said sales and purchases for said defendants unusually large and unearned profits * * *" and that the "said defendants would and did cause" the Commission in October, 1937, and September, 1938, for two purchases of a total of 233 International Harvester Trucks and equipment, to pay a "total sum of $397,332.05" out of which they made a net profit of $111,370.56. It is true that the indictment then proceeds in separate paragraphs to describe in detail the circumstances of the two sales in October, 1937, and September, 1938, but the question is, not what was done, but what was the scheme, and was it the same scheme in each instance. I think, reduced to simple language, the bill attempts to say and does say that the defendants entered into a scheme or agreement among themselves, that they would sell through the Younger Motor Truck Company, Inc., and purchase for the Highway Commission, through Leche, Abernathy and Thomas, trucks, not in the proper, usual and ordinary course and at prices which they knew could be had at great savings to the State and its taxpayers, but under the circumstances charged for the purpose of realizing great profits for themselves in the manner detailed in the bill, and it is clearly alleged that both of the sales and purchases were made in furtherance of this scheme. In other words, the indictment says that this was the scheme, and the fact that things done in execution thereof may have been at different times, separated in point of time as much as a year or more, did not serve to make it a different one. In fact, it is conceivable that parties, situated as the defendants were, could have devised such a scheme to run throughout the four years administration of a single Governor and his appointees. I see no reason why it might not be executed for a time under circumstances similar to those charged, then lie dormant for a period for whatever reasons might exist, be revived and further illegal profits be realized at later dates. It would nonetheless be the same scheme. The fact that other or different persons were dealt with or drawn in, either as sellers or as violators of the law, would not serve to make it a new or different scheme. See Van Riper et al. v. United States, 2 Cir., 13 F.2d 961; Sconyers v. United States, 5 Cir., 54 F.2d 68. The principles involved are quite similar to those governing a conspiracy. The latter may exist and extend over a period of years, and have others drawn into it, so long as it remains a single conspiracy. Alexander v. United States, 8 Cir., 95 F.2d 873; Stumbo v. United States, 6 Cir., 90 F.2d 828.

My view is that, based upon its allegations alone and until evidence to the contrary appears, the indictment alleges but one scheme and is not amendable to the attack of duplicity.

### As to the Bills of Particulars.

Separate motions for bills of particulars were filed by the defendant, Leche, and the defendants, Abernathy and Younger. That filed on behalf of the first named defendant requested information as to matters covered by counts two and three of the indictment, while that of the other two defendants demanded information as to a multiplicity of matters, most of which, I think, are of an evidentiary nature, except as to paragraph 5 of the motion which requests the names of persons, who participated in the portions of the purchases paid to Thomas, and this was supplied voluntarily on the date of argument by counsel for the Government.

My view is that the request (common to both motions) that the defendants "should be informed as to how and in what way" the drafts described in counts two and three figure in the matter, and "what relationship said documents bear to the aforesaid alleged scheme and artifice to defraud" should be granted. Otherwise, the motions should be denied.

The demurrer should be overruled and the motions for particulars granted to the extent indicated.