**UNITED STATES v. DECKER et al.**

No. 19991.

District Court, D. Maryland.

July 24, 1943.

Bernard J. Flynn, U. S. Atty., of Baltimore, Md., Wm. A. Paisley, Sp. Asst. to Atty. Gen., and Ellis L. Arenson, Sp. Atty., Department of Justice, of Baltimore, Md., for plaintiff.

William Curran and R. Palmer Ingram, both of Baltimore, Md., for defendant Decker.

Simon E. Sobeloff, of Baltimore, Md., for defendant Kann.

CHESNUT, District Judge.

At the trial of this case the jury convicted both defendants for violation of 18 U.S.C.A. § 338, the mail fraud statute. Both defendants have filed motions in arrest of judgment and for a new trial. These motions do not present any new points in addition to those urged at the trial, but respective counsel for the defendants have argued the motions with earnestness and ability and have also filed elaborate briefs with an excellent discussion of the applicable law. I have therefore carefully considered the matter anew, as a result of which, however, I adhere to the view that the case was properly submitted to the jury for their consideration of the facts.

The motion in arrest of judgment properly presents only the question arising on the demurrer to the indictment which was overruled in an opinion filed in this and others of a series of cases on April 9, 1943. The demurrer was then overruled after oral argument and on briefs submitted. This question has not been re-argued on the present motions and therefore the motions in arrest of judgment are hereby *overruled*.

Two essential facts required to be found for conviction under the mail fraud statute are (1) devising a scheme or artifice to defraud and (2) for the purpose of executing such scheme or artifice, placing or causing to be placed a letter, package or writing in any post office or authorized depository for mail matter to be sent or delivered by the United States mail. It is not now contended that the evidence was insufficient to show the making or adoption by the defendants of a scheme or artifice to defraud; but it is earnestly contended that the mails were not used or caused to be used by the defendants or either of them for the purpose of executing the scheme. The latter contention as now elaborately argued is that the evidence was insufficient to show (1) that the defendants *caused* the mails to be used; (2) insufficient to show that the mail was used at Elkton (or elsewhere within this Maryland district); or (3) to show that the mails were used "for the purpose of executing such scheme."

The nature of the case and the summary of the evidence was contained in the charge to the jury, which has been transcribed by the stenographer. This is here referred to for the purpose of shortening this memorandum opinion. It is sufficient now to repeat that the scheme alleged and proved was one to defraud a Maryland corporation, Triumph Explosives, Inc., engaged at the times in question (1941-42) at Elkton, Maryland, to a very large extent in the manufacture of munitions of war, of which corporation Kann was the president and the defendant Decker was the executive vice president. The corporation had entered into a contract with certain foreign governments to manufacture a large quantity of ammunition. The particular scheme was that the defendants would pay to themselves from the funds of the corporation by checks drawn by them on the corporation's bank accounts in an Elkton bank and in a Pittsburgh bank from time to time, sums equal to 5% of fully executed and paid for contracts, or 2½% on sums payable or paid on partly executed contracts. It was further a part of the scheme that the withdrawal of these corporate funds for the personal benefit of the defendants should be concealed from the stockholders of the corporation by charging the amount of the checks to an expense item on the books entitled "commissions" and entries made showing that the moneys had been paid to a Miss Jackson who was an employe of the corporation. The sums aggregating about $84,000 were consequently so withdrawn from the corporate bank accounts by checks from time to time over a period of about a year, during 1941-42. All these checks were made payable to Miss Jackson and endorsed by her and cash therefor or cashier's checks received from the Elkton State Bank where the corporation had an account. In all, nine such checks were drawn and the proceeds immediately handed over by Miss Jackson to the defendants.

Of the nine checks, five were drawn on the bank of the Peoples Pittsburgh Trust Company of Pittsburgh, Pennsylvania, aggregating a little more than $50,000. The remaining four checks were drawn on the corporation's bank account in the Elkton, Maryland, bank. The indictment was in five counts, each setting out the scheme and each count reciting that the defendants caused one of the five checks on the Pittsburgh bank to be mailed from Elkton, Maryland. All five checks were produced in evidence and by endorsement thereon showed that they had been cashed at the Elkton bank, and endorsed by it in the usual way, and the further endorsements showed payment by the Pittsburgh bank through the Pittsburgh Clearing House. The scheme and the false entries were not discovered until in September 1942 when the books of the corporation were audited by Lt. Com. Seidman, then an officer of the Navy Department of the United States, who was then making an audit of the books of the corporation under orders from the Navy Department, in connection with a pending proposal for a renegotiation of other contracts between the corporation and the Navy Department.

Neither of the defendants testified at the trial and there was no direct testimony as to what disposition they had made of the $84,000 with the exception of oral admissions made by them to Lt.Com. Seidman that they had retained or used for their personal benefit one-half of the whole amount and had paid over the remaining half to some foreign person or persons whose names they declined under any conditions to reveal. There was also circumstantial and possibly some direct evidence from some of the endorsements on some of the drafts received from the Elkton bank that a substantial part of the money had been used or applied for Decker's personal benefit. There was also some not very explicit or satisfactory evidence that the defendants had said or reported to the board of directors of the corporation at one time that all moneys had been used for the benefit of the corporation.

The particular contention now urged by counsel for the defendants is that the evidence failed to show that the mails were used for the purpose of executing the scheme to defraud, but before further discussing that contention it is necessary to note the preliminary contentions to the effect that there was no legally sufficient evidence of the mailing of the checks by the Elkton bank directly or indirectly to the Pittsburgh bank for collection. The government's evidence on this point was principally in the testimony of the cashier of the Elkton bank, who said that the checks had been mailed in due course of business but whose testimony as a whole showed that he personally had no definite knowledge of the individual mailings although he did very fully and definitely describe the customary course of business of the bank in the handling of checks drawn on banks in other places, and stated that it was the invariable custom, with a minor exception not here applicable, to forward such checks for collection by mail placed in the Elkton post office. Counsel for the defendants also point out that the mailing clerk of the bank was not called as a witness although the cashier's testimony showed that that clerk had or would naturally have no recollection of the individual mailings. In other words, the evidence as to actual mailing and mailing at Elkton was based on the usage and custom of the bank very fully and definitely proven by the cashier. The defendants contend that this was insufficient evidence of the fact for the jury to consider. I cannot agree that this contention is sound under the better modern law of evidence.

It must be admitted that there are many decisions in the older cases and some in the later, possibly a majority of all, that tend to support the defendants' contention. See Annotation in 25 A.L.R. 9, 13. But there are also numerous modern cases in the law of evidence (some arising in federal prosecutions under the mail fraud statute) which hold that satisfactory proof of a customary course of business with respect to mailing is sufficient, in the absence of contradiction (and there was none in this case) to show the fact of mailing. Counsel for the government have cited in their brief a number of such cases, among which may be noted Headley v. United States, 5 Cir., 294 F. 888; Levinson v. United States, 6 Cir., 5 F.2d 567, certiorari denied 269 U.S. 564, 46 S.Ct. 23, 70 L.Ed. 414; McIntyre v. United States, 6 Cir., 49 F.2d 769; Rosenberg v. United States, 10 Cir., 120 F.2d 935; Freeman v. United States, 3 Cir., 20 F.2d 748, 750, and it is stated by counsel for the government that the record in Tincher v. United States, 4 Cir., 11 F.2d 18 (a mail fraud case) shows that the proof of mailing of the letters was

based on proof of custom by the banks. See, also, Dunlop v. United States, 165 U.S. 486, 495, 17 S.Ct. 375, 41 L.Ed. 799; and Myers v. Moore-Kile Co., 5 Cir., 279 F. 233.

■ In principle such evidence of custom when clearly and definitely proven, and in the absence of substantial contradiction, should be held sufficient. This is the view expressed in Wigmore on Evidence, 2d.Ed., vol. I, § 95, and 1934 Supplement, § 95. It is also in accordance with the Maryland rule, Wolf v. Union Trust Co., 150 Md. 385, 391, 133 A. 121, where the cases are reviewed by Judge Parke with his customary clarity and thoroughness. That case also holds that it is not legally necessary to call as a witness the mailing clerk although the failure to call such a clerk might affect the weight of the evidence. See, also, Myers v. Moore-Kile Co., 5 Cir., 297 F. 233, supra.

■ We must also bear in mind that in the instant case we are not dealing with the legal sufficiency of proof to show the receipt by the addressee of a disputed letter in an isolated transaction, but with a customary course of business in a banking institution where many checks are handled and forwarded by mail every day; nor is there any dispute here that the checks drawn on the Pittsburgh bank were in due course of business received and paid by it and charged to the corporation's account. No one, outside of court, would have any reasonable doubt that these five checks on the Pittsburgh bank were forwarded in the usual course of banking business by mail from Elkton. The evidence of such a customary course of business in banking practice is so substantial and generally known that there is no good legal reason in principle for not accepting such evidence in court as legally sufficient, in the absence of contradictory facts.

■ It is also contended that the evidence is insufficient to establish the proper venue jurisdiction of the court in the particular case in that even if the checks were forwarded by mail it was not sufficiently and definitely shown as a fact that the checks were deposited in the mail in Elkton or elsewhere in Maryland. Where the envelope containing the mail enclosure is available the post mark would be sufficient evidence, but naturally in a banking transaction of this kind such envelopes would not be preserved. Furthermore the cashier of the Elkton bank said in effect as a part of the custom that the Elkton post office was customarily used for mailing foreign checks, as naturally would be the case. There was no contradictory evidence of any kind in this case. The evidence I think was legally sufficient for the jury to find the proper venue in this district. See Headley v. United States, 5 Cir., 294 F. 888, supra; Levinson v. United States, 6 Cir., 5 F.2d 567, supra; McIntyre v. United States, 6 Cir., 49 F.2d 769.

■■ A more substantial contention is that defendants in this case are not responsible for the mailing of the checks on the Pittsburgh bank because such mailing was not *caused* by the defendants *for the purpose of executing the scheme*. It was of course necessary for the government to submit legally sufficient evidence to show (1) that the defendants caused the checks to be mailed and (2) that the mailing was for the purpose of executing the scheme. All these questions of fact as well as the fact with respect to mailing at Elkton were fully left to the jury to determine on the evidence. The emphasis of the argument by counsel for the defendants is not now placed on the point as to whether, if there was a mailing, it was caused by the defendants, but rather on the point that the mailing was not for the purpose of executing the scheme. With respect to whether the defendants caused the mailing, there was naturally no evidence that they had expressly told the Elkton bank to forward the checks by mail, but such an express authority was not necessary under the decisions. The issue is one of causation. United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836; Demolli v. United States, 8 Cir., 144 F. 363, 6 L.R.A.,N.S., 424, 7 Ann.Cas. 121; United States v. Weisman, 2 Cir., 83 F.2d 470, 107 A.L.R. 293. It must be remembered that the defendants were executive officers of a large corporation experienced in banking practice. Their scheme was to withdraw the funds of the corporation for personal benefits and to conceal the withdrawals from the corporation and its stockholders by false entries on the corporate books of account. To accomplish this, they drew five checks on the Pittsburgh bank and for convenience, instead of sending the checks directly to the Pittsburgh bank, had them handled locally through the Elkton bank. The scheme was not to defraud the Elkton bank but their own corporation, and this

would not be actually accomplished of course unless and until the corporate funds were successfully and actually withdrawn from the Pittsburgh bank.

The main contention now stressed is that the mailing of the checks was not for the purpose of executing the scheme because the fraud had been *completed,* and the benefits of the fraud obtained by the defendants immediately upon the cashing of the checks by the Elkton bank; or, otherwise stated, the scheme had been fully executed when the money was received by Miss Jackson and paid over to the defendants in Elkton and, therefore, the subsequent forwarding of the checks by the Elkton bank was merely for the purpose of reimbursing itself and therefore for a purpose in which the defendants had no interest. And the argument is sought to be supported by the technical law of negotiable instruments that the title to the checks passed to the Elkton bank which thereupon became a holder in due course and its title in that respect could not be defeated by any subsequent stoppage of payment of the checks. But this contention ignores the real nature of the scheme to defraud in this case. The scheme was a continuing one formed in 1941 and running over the period of a year thereafter. It was not an isolated transaction in which a person fraudulently obtains the check of *another* on a foreign bank and immediately has it cashed. Here the scheme was by officers of a corporation to defraud, not the local Elkton bank, but the corporation of which they were officers, by drawing checks on the corporation's bank accounts and concealing the transaction by false entries on the corporate books. Clearly the defendants contemplated that the checks on the Pittsburgh bank would in due course of banking practice be forwarded by mail and paid by the Pittsburgh bank and charged to the corporation's accounts. They had no thought of simply abstracting or otherwise stealing a sum of money from the corporation and then discontinuing their relations with the corporation. It was of the essence of their scheme that the moneys of the corporation should be effectively withdrawn from the bank account and the improper withdrawals concealed by false entries on the books as a continuing scheme lasting over a period of many months and doubtless intended to be concealed forever.

■ Counsel for the defendants have submitted a brief containing an elaborate review of the authorities. In reading them discrimination should be made between points of discussion, as to whether the evidence was sufficient to show that the defendants *caused* the mails to be used, and the point as to whether the scheme had been *completed* when the foreign checks were mailed for collection. The principal cases cited by counsel for the defendants on the latter point are Spillers v. United States, 5 Cir., 47 F.2d 893; Stapp v. United States, 5 Cir., 120 F.2d 898; and United States v. McKay, D.C., 45 F.Supp. 1001. But the facts in these cases differ materially from the instant case with respect to the nature of the scheme to defraud. The scheme here was much nearer on the facts to that discussed in Hart v. United States, 5 Cir., 112 F.2d 128, certiorari denied 311 U.S. 684, 61 S.Ct. 60, 85 L.Ed. 441. See, also, United States v. Leche, D.C., 34 F. Supp. 982, affirmed 5 Cir., 118 F.2d 246. The effect of the Hart case as an authority here in favor of the government is obviously realized by defendants' counsel who criticize it strongly as inconsistent in principle with earlier and later cases in the Fifth Circuit, particularly Spillers v. United States, supra, and the later case of Stapp v. United States, supra. See, also, United States v. McKay, supra. The criticism, however, seems not sound when the differences in facts of the several cases is considered. The Fifth Circuit has not itself disapproved the Hart case. See Dunham v. United States, 5 Cir., 125 F.2d 895, 897; Steiner v. United States, 5 Cir., 134 F.2d 931, 934. All the cases recognize the sound principle that the mailing of the checks for collection must be in execution of the scheme, and it is also recognized that if the scheme has been completely executed before the checks are mailed, the mailing is not in furtherance of the scheme. The crucial question therefore in each case is whether the scheme had been completely executed when the checks were mailed, or whether the mailing was a contemplated incident of the whole scheme which was still a continuing one until the checks were paid.

On this latter point counsel for the government here point to the decision in this Fourth Circuit in the Tincher case, supra, as controlling authority in the instant case. Counsel for the defendants seek to dis-

tinguish the Tincher case on the ground that Judge Parker's opinion indicates that the checks were mailed by the banks *for collection only,* and that otherwise the mailing would have been independent acts of the banks for their own account if they had cashed the checks and thus become holders thereof in due course. On page 21 of 11 F.2d the paragraph in the opinion pointed to reads as follows:

"With respect to the counts charging the forwarding of the checks for collection, it appears that the mails were used by the banks with whom these checks were deposited without knowledge on their part of the fraudulent scheme; but the defendants caused the checks to be deposited in these banks with knowledge that the mails would necessarily be used in their collection, and the collection of the checks was a necessary part of the working out of the scheme. In fact, it is through the collection of these checks that the defendants collected and divided the spoils of their fraud. In such case the defendants were responsible for the use of the mail by the banks, though the banks were entirely innocent agencies."

 Defendants say that this part of the opinion shows that it was only because the banks took the checks for *collection,* instead of cashing them and becoming holders in due course, that the defendants in that case were responsible for the mailing by the banks. It will be noted, however, from the facts of the case that checks referred to had been in fact wholly or partly cashed by the banks who forwarded them for collection. See page 19 of 11 F.2d. It is also urged by counsel for the defendants that it does not appear that, in the Tincher case, the question as to whether the banks became holders of the checks in due course, as distinguished from taking them for collection only, was made and specially considered by the court, and therefore the case should not be regarded as binding authority here where the evidence shows that under the Maryland statutory law of negotiable instruments (see Md.Code, Art. 13, §§ 49, 53, 76; Helvering v. Stein, 4 Cir., 115 F.2d 468), the Elkton bank by cashing the checks became the holder in due course. But despite this comment on the Tincher case, I feel that it is an authority on the point under discussion which should be followed here in this case. Besides this, however, the technical question of negotiable instruments law is not the conclusive factor in determining whether the defendants caused the mailing of the checks in furtherance of the scheme. That the Elkton bank became the holder of the checks in due course is merely one fact to be considered in determining whether the defendants caused the mailing of the checks in furtherance of the scheme. This ultimate question depends largely upon the nature of the scheme itself which in this case we have seen was a continuing one which contemplated ultimate withdrawal of the funds from the Pittsburgh bank.

For these reasons I have concluded that the motions in arrest of judgment and for a new trial on behalf of both defendants should be and they are hereby *overruled.*