## AULEN et al. v. TRIUMPH EXPLOSIVE, Inc.

### No. 2173.

District Court, D. Maryland.

Dec. 5, 1944.

Harry Troth Gross and Wirt A. Duvall, Jr., both of Baltimore, Md., for plaintiffs.

J. Roland Johnston and Thorp, Bostwick, Reed & Armstrong, all of Pittsburgh, Pa., and Wm. D. Macmillan and Semmes, Bowen & Semmes, all of Baltimore, for defendant.

CHESNUT, District Judge.

This is a private civil nonjury suit by two individual employes of Triumph Explosives, Inc., a Maryland corporation, to recover further compensation under the Fair Labor Standards Act, 29 U.S.C.A. § 207, for hours of work in excess of forty hours a week. All the testimony has been

taken in court and the case argued by counsel and submitted for decision. The principal defense is that the employes were employed in a *professional* capacity and therefore are not within the provisions of the Act, which, in section 213, reads in part: "(a) The provisions of sections 206 and 207 of this title shall not apply with respect to (1) any employee employed in a bona fide executive, administrative, professional, or local retailing capacity, or in the capacity of outside salesman (as such terms are defined and delimited by [said] regulations of the Administrator)." On October 24, 1940, the Administrator published a regulation (§ 541.3) defining and delimiting the term "professional" as so used in section 213. It is presently in force (5 Fed.Reg. 4077) and reads:

"Section 541.3—Professional.

"The term 'employee employed in a bona fide * * * professional * * * capacity' in section 13(a) of the Act shall mean any employee who is—

"(A) engaged in work—

"(1) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work, and

"(2) requiring the consistent exercise of discretion and judgment in its performance, and

"(3) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time, and

"(4) whose hours of work of the same nature as that performed by nonexempt employees do not exceed 20 per cent of the hours worked in the workweek by the nonexempt employees; provided that where such nonexempt professional work is an essential part of and necessarily incident to work of a professional nature, such essential and incidental work shall not be counted as nonexempt work; and

"(5)(a) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study, as distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine, mental, manual, or physical processes; or

"(b) predominantly original and creative in character in a recognized field of artistic endeavor as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training and the result of which depends primarily on the invention, imagination, or talent of the employee, and

"(B) compensated for his services on a salary or fee basis at a rate of not less than $200 per month (exclusive of board, lodging, or other facilities); provided that this subsection (B) shall not apply in the case of an employee who is the holder of a valid license or certificate permitting the practice of law or medicine or any of their branches and who is actually engaged in the practice thereof."

Before so revising the regulations the Administrator held hearings and received a report which, in section 8, contains an extended discussion and commentary on the revised regulation defining the word "professional". This will be found in the publication of the United States Government Printing Office at Washington (1940) of the United States Department of Labor, Wage and Hour Division, entitled "Executive, Administrative, Professional * * Outside Salesmen", defined pages 33 to 43.

### Findings of Fact

1. Prior to 1941 the defendant, Triumph Explosive, Inc., with a plant at Elkton, Maryland, was engaged principally in the manufacture of fireworks. It had then only a few hundred employes. But beginning in 1941 the volume of its business was first much increased by contracts for supply of munitions to foreign governments and then again greatly further increased after the entry of this country into the war, when the corporation entered into large contracts with our government, one being a $25,000,000 ammunition contract with the Navy Department. The number of employes shortly became about 10,000. This sudden and great expansion of activities necessitated a very rapid plant expansion, including new buildings and much new machinery for the new and changed production of the corporation. It also required a much larger departmental organization.

2. One of the new departments was under the Chief Engineer of the Company, G. A. F. Winckler. His department was divided into sections of (1) design, (2) fabrication and installation, (3) maintenance, and (4) miscellaneous. The department of design included a subdepartment of machinery and particularly 40 millimeter

shells to be made under government contract. At the head of this department was Mr. H. W. Morgan and under him were four machine designers, including the plaintiffs, Oscar A. Wurtenberg and Walter A. Aulen. Mr. G. T. Pierce was another machine designer who headed eleven mechanical draftsmen. The plaintiffs, Wurtenberg and Aulen, were employed late in 1941 and early in 1942 respectively as "machine designers". Wurtenberg was 27 years old and Aulen was 37 years old. Their preliminary and technical education was about the same. Both had attended recognized high schools and each had pursued special technical courses in draftsmanship and machine design and both had taken night courses for several years at polytechnic schools, one known as the Brooklyn Polytechnic School (an engineering school) and the other at Union City, N. J. Wurtenberg had pursued these night courses for five years on an average of three hours several nights a week, which he said was a course equivalent to three years in college. Neither had received a degree but prior to their employment by the defendant each had had many years' experience with industrial corporations in draftsmanship, and machine design. As Aulen was older than Wurtenberg, he had had the larger experience; but both were "very fine" machine designers. Morgan was the chief designer in this department. His technical education was less than that of Aulen and Wurtenberg, but his experience was longer and he was employed by the defendant before they came. He was made by Winckler the head of the particular department over Wurtenberg and Aulen but the quality of his work in designing was substantially the same as theirs and they were equally qualified to do machine designing. Morgan also had some supervisory work and other outside work.

3. The nature and character of the work done by the plaintiffs is most clearly described in the testimony of Winckler. For illustration, the construction of the new 40 millimeter shells required the design of a new type of machinery not theretofore available in this country. Winckler, who is a graduate electrical engineer, but not a good machine designer, conferred with Morgan as to requirements of the new type of machinery, and Morgan in turn explained the general idea to Aulen and Wurtenberg, who in turn designed the new type of machinery required. Machine designers require special technical study and education for their field of work. They must be familiar with the scientific literature and understand the nature of physical actions and phenomena known as torque, inertia, stresses and linkages, and understand trigonometric functions. Design is a branch of mechanical engineering. A mechanical engineer may go into stationary engineering, bridge construction or into machine designing. Machine designing is one of the specializations of a mechanical engineer. To completely design a new machine, such as a crimping machine for the 40 millimeter shells, a machine designer with a background of necessary education must mentally conceive the kind of machine necessary to do the particular work, and the design must then be implemented by detail on paper to show how the design is to be carried out. The type of work is predominantly intellectual and creative rather than routine. The layout or detail reduction to paper is necessarily incidental to the design. It may be done by the designer, or may be delegated to others. Many designers prefer to do their own layout or detail work, rather than trust it to others. The work of a machine designer requires the exercise of discretion or judgment in its performance, and being creative and predominantly intellectual in nature, cannot be standardized in relation to a given period of time. The plaintiffs designed many different machines and in that respect their work was varied in nature.

4. Wurtenberg was employed by the defendant from October 21, 1941, to July 9, 1943; Aulen was similarly employed from April 27, 1942, to July 26, 1943. Both originally were employed by Morgan, and on the basis of a salary of $75 a week to Aulen, without specification of number of hours of the workweek. Wurtenberg was originally employed at $60 a week but subsequently increased from $60 to $65, to $70 and finally to $75 a week, also without reference to the number of hours of the workweek. When Wurtenberg was first employed the defendant's factory was working 40 hours a week, but in a few weeks the workweek was increased to 44 hours and then to 48 hours, and for a short time to 51 hours. When Aulen was first employed the factory was on a forty-four or forty-eight hour week. It was stipulated by counsel that Wurtenberg had 630 hours of excess hours of work over 40 hours per

week, and Aulen had 456 hours. On several occasions each of the plaintiffs asked Morgan that he be paid for overtime work but this was never promised the plaintiffs although it was stated that the general subject matter of the classification of employes with respect to overtime work was under consideration by the executive management. Both plaintiffs finally left the employment of the defendant because, as they put it, they became satisfied they would not be paid for overtime work.

5. In consequence of the sudden and rapid expansion of the defendant's activities, and the very large increase in the number of its employes, careful and comprehensive consideration was not given by the then management of the Company to the requirements of the Fair Labor Standards Act of 1938, 29 U.S.C.A. § 201 et seq. And in 1942 certain financial irregularities in the management of the Company developed which resulted in the government taking over the management of the corporation temporarily from October 1942 to February 1943. See United States v. Decker et al., D.C., 51 F.Supp. 15, 20; Id., 4 Cir., 140 F.2d 375; Id., 4 Cir., 140 F.2d 378, 380.

The personnel of the new corporate management took over on March 1, 1943, and promptly appointed a competent committee consisting of the superintendent and an assistant superintendent of industrial relations, and an experienced lawyer and another executive officer to give comprehensive consideration to the classification of employes as required by the Fair Labor Standards Act. On June 14, 1943, they considered many individual cases for classification and determined that the plaintiffs were properly to be classed as professional employes and therefore not entitled to extra compensation for overtime work. At the same time they classified one R. W. Pearson, an employe who had been originally employed as a machine designer but whose work in that respect was found not satisfactory and who had been transferred to so-called expediting work, as a nonexempt employe and he was accordingly paid extra compensation for his overtime work. In the departmental organization on the chart prepared by Mr. Winckler, Pearson was classified as a mechanical draftsman under G. T. Pierce. The clear distinction between a mechanical draftsman and a machine designer is pointed out in the testimony of Winckler. The work of a mechanical draftsman is essentially copying and not creative work. It is manual rather than mental. I am satisfied from the evidence that the classification by this committee was made in good faith and after careful consideration, although it is of course not binding or in any way conclusive in this case.

6. In performing their whole work the plaintiffs say they spent about half of their time (more than 20 per cent) in translating their ideas of design into concrete expressions by layout or detail work on paper; but the evidence does not show that they were required to do this generally but did so only in connection with their intellectually creative work in the designing of the machines, and such detail work was essential and necessarily incidental to their main employment of designing.

My *conclusion of law* is that the work performed by plaintiffs was within the definition of the term "professional" as defined by the Administrator, and therefore the judgment in the case must be for the defendant.

### Opinion

The question is whether the nature and character of the work performed by the plaintiffs is within the definition of the word "professional" as defined and delimited by the Administrator. The validity of his definition as a regulation is not challenged by any of the parties. The question is almost entirely one of fact. The law of the case is not really in dispute.

The Fair Labor Standards Act is "remedial and humanitarian in purpose. * * * Such a statute must not be interpreted or applied in a narrow, grudging manner." Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123, 321 U.S. 590, 597, 64 S.Ct. 698, 703. The regulation has been held valid in a number of cases. Walling, Adm'r v. Yeakley, 10 Cir., 140 F.2d 830; Sun Pub. Co. v. Walling, 6 Cir., 140 F.2d 445; Lawley & Son Corporation v. South, 1 Cir., 140 F.2d 439, 151 A. L.R. 1081; Fanelli v. United States Gypsum Co., 2 Cir., 141 F.2d 216. It has been held that claims for exemptions under the Act are subject to a strict construction. Bowie v. Gonzalez, 1 Cir., 117 F.2d 11, 16; Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52. But as the regulation is valid the only question here is whether defendant's claim for exemptions as to the plaintiffs' work fairly comes within the Administrator's definition.

There have been a number of judicial decisions regarding executive and administrative employes but very few applying the Administrator's definition of "professional". In Sun Pub. Co. v. Walling, supra, it was held that newspaper reporters and some editors were not professional employes within the definition because their work was not of a nature usually or customarily prepared for by a long course of training and study or because the particular employes did not receive a salary of at least $200 a month, or both. See also Mabee v. White Plains Pub. Co., 180 Misc. 8, 41 N.Y.S.2d 534. In People ex rel. Tower v. State Tax Commission, 282 N.Y. 407, 26 N.E.2d 955, 957, it was held, under a New York tax statute exempting income from personal service "in the practice of any other profession", Tax Law, Consol. Laws, c. 60, § 386, that the business of a custom house broker was not a profession as it did not require knowledge of an advanced type in a given field. But in Abrams v. Genauer, Misc., 29 N.Y.S.2d 974, it was held under the federal statute that "a designer of men's clothing exercised discretion, independent judgment, and skill" and hence was not entitled to the benefits of the Act; and further that "although he testified that he was employed as a cutter as well as a designer, the court believes that the cutting was incidental to designing."

As the Administrator's definition of "professional" is comprehensive and meticulous, its provisions must be applied here rather than the common or popular understanding of the term professional either in common usage or by standard dictionary definition. Fifty years ago it is probable that the plaintiffs' occupation as machine designer would not have been classed as a profession; but it is evident from the Administrator's definition that the scope of the term "professional" has been much broadened for administration of the Act. In recent years many new professions have become recognized. It was said in United States v. Laws, 1895, 163 U.S. 258, 266, 16 S.Ct. 998, 1001, 41 L.Ed. 151, "Formerly, theology, law, and medicine were specifically known as *'the professions'*; but as the applications of science and learning are extended to other departments of affairs, other vocations also receive the name. The word implies professed attainments in special knowledge, as distinguished from mere skill."

The Administrator's present definition of "professional" was made effective October 24, 1940. It revised an earlier definition which in some respects had proven unsatisfactory. Before adopting the revision, extended hearings were held and when the new definition was published it was accompanied by an elaborate report reviewing the effect of the hearings and explaining the reasons for the revised form. See also Ralph Knight, Inc. v. Mantel, 8 Cir., 135 F.2d 514, 517. In this connection the report stated, p. 34: "The present definition of the term 'employee employed in a bona fide * * * professional * * * capacity' has been productive of some confusion because the wording is not sufficiently clear to indicate in all cases the general type of employee to whom the definition should be applicable. It is clear, for example, that many employees in the traditional learned professions would be exempt, but it is not clear to what extent the definition is supposed to apply to employees in the more modern professions, in the quasiprofessions and in artistic callings. There still remains a large group of employees who, if they are to be exempt at all, would be exempt under the term 'professional'. This group includes persons in the more recent professions, or in vocations which are sometimes described as professional, or in artistic fields."

As heretofore stated, I find that the plaintiffs' work comes within the Administrator's definition of "professional". It will be noted that the definition sets up six separate requirements which are all, except 5(a)(b), in the conjunctive. The character of the plaintiffs' work meets each of these several tests. The work was predominantly intellectual and varied in character; required the consistent exercise of discretion and judgment in its performance; could not be standardized in relation to a given period of time, and, if it be assumed that the layout or detail work referred to was nonexempt work, it was nevertheless an essential part of and a necessary incident to the work of a more professional nature; and the plaintiffs were compensated by salary which was greatly in excess of the minimum of $200 per month required in the definition.

With respect to the last named test, rate of compensation, the report above referred to said, "The salary paid the employee is the best single test of the employer's good

faith in characterizing the employment as of a professional nature." And this is clearly consistent with the Congressional declaration of policy (section 202) to correct labor conditions detrimental to the maintenance of the minimum standard of living for the health, efficiency and general well-being of the workers. Nor were the plaintiffs unfairly treated by the defendant. They were employed at a weekly salary without stipulated number of hours in the workweek; and their alleged overtime work was directly due to the war conditions. They did not punch a time clock.

It is unnecessary to discuss the application of all the requirements of the definition to the plaintiffs' work. Most of them are, I think, self-evident from the facts found. 5(a) of the definition requires knowledge of an advanced type in the field of science or learning *customarily* required by a prolonged course of specialized intellectual instruction and study as distinguished from a general academic education and from an apprenticeship and from training of routine mental, manual or physical processes. It will be noted that a professional degree is not indispensable although, as indicated in the report, when held it is prima facie evidence of professional qualifications. The definition merely requires the kind of special training and knowledge which is *customarily* acquired by a prolonged course of intellectual instruction. The plaintiffs did have a prolonged course of technical instruction in draftsmanship and machine design, although they did not complete the course and obtain a degree of mechanical engineer which would have been the result of a successful completion of their courses. But after several years of technical education they went into active employment in mechanical draftsmanship and machine designing with several industrial companies, which, no doubt, added greatly to their technical education, and, as stated by Winckler, they were "very fine" designers. The knowledge which they acquired first at the technical schools and subsequently in the actual practice of machine designing resulted in their having the kind of knowledge required by the definition. Machine designing is a branch of mechanical engineering and, as pointed out by the witness Winckler, is one of the specializations of that profession.

The testimony of the plaintiffs perhaps unconsciously tended to depreciate the quality and dignity of their work. This was consistent with their contention in the case, although it is rather unusual for a workman to minimize his own work. I think a more disinterested description of the character of the plaintiffs' work was given by the witness Winckler, who was an electrical engineer at the head of their department. To the extent that their evidence is in conflict with his, I have accepted the latter's testimony as more correctly descriptive and less interested. Although still employed by the defendant, his testimony seemed to me to be clear, unbiased and convincing.

Counsel for the plaintiffs stress that feature of the definition [A(4)] which requires a professional employe to be not occupied more than 20% of his time in work of a nonprofessional nature unless the latter is essential to and a necessary incident of the professional work. They point to the evidence that more than 20% of the plaintiffs' time was spent in layout or detail work which they contend should be classified as nonprofessional. That it should be so classified is far from clear from the evidence. On Winckler's evidence, which I accept on this point, the line of demarcation between professional and nonprofessional work should be drawn between machine designing and mechanical drafting. The latter requires predominantly only skill of hand while machine designing requires skill of mind. This is the distinction that is made in the Wage and Hour Manual, 1943 Ed., pp. 259, 260, with respect to designers and draftsmen in engineering offices. But the layout and detail work which the plaintiffs did was in a higher class than that of mechanical draftsmen. Counsel for the plaintiffs contend that the line of demarcation should be drawn between Morgan and the plaintiffs but the evidence shows that Morgan was the chief machine designer and, to the extent that he did design, his work was in the same class as that of the plaintiffs. He also at times did layout and detail work on his own designs. The plaintiffs did not do layout and detail work generally but only that directly connected with their own designing; and they apparently did this voluntarily and preferably to undertaking to verbally explain their ideas of design to less qualified employes in the department. Machine designers often do their own detail work because they prefer to do this for their professional pride rather than trust to

possibly imperfect work done by draftsmen who may not correctly interpret the oral instructions of the designer.

Moreover, even if it be assumed that the layout and detail work was nonexempt work, nevertheless it is properly included within the definition of "professional" because it was an essential and necessary incident of the professional work. It is too closely related to the latter to be properly severable therefrom in its classification. A machine design has no utility until the ideas are concretely translated on to paper by layout or detail work. The latter is, therefore, clearly essential to and a necessary incident of the design.

For these reasons I think the plaintiffs' work was within the definition of "professional" and, therefore, the judgment must be for the defendant. Counsel may submit the appropriate order in due course.