## UNITED STATES v. WEISMAN.

No. 380.

Circuit Court of Appeals, Second Circuit.
May 11, 1936.

Miller, Owen, Otis & Bailly, of New York City (Harold H. Corbin and Maurice Finkelstein, both of New York City, and Harry H. Weinberger, of Passaic, N. J., of counsel), for appellant.

Lamar Hardy, U. S. Atty., of New York City (John F. Dailey, Jr., Asst. U. S. Atty., and Irving R. Kaufman, Sp. Asst. to U. S. Atty., both of New York City, of counsel), for the United States.

Before MANTON, SWAN, and AUGUSTUS N. HAND, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an appeal by the defendant, Leonard Weisman, from a judgment convicting him of violation of counts 1, 4, and 5 of an indictment, found under section 215 of the United States Criminal Code (18 U. S.C.A. § 338), for using the United States mails in a scheme to defraud. The first count of the indictment set forth the scheme and alleged that for the purpose of executing it the defendant "did unlawfully, wilfully and knowingly place and cause to be placed in an authorized depository for mail matter, to wit, a Post Office in the Borough of Manhattan, City of New York, to be sent and delivered by the Post Office Establishment of the United States, a certain writing, to wit, a letter, signed by J. E. Bell, enclosed in a postpaid envelope addressed to Mr. Robert Lewis, 99 So. Fitzhugh St., Rochester, N. Y."

Count 4 realleged the scheme to defraud set forth in the first count and further stated that for the purpose of executing it the defendant "did unlawfully, wilfully and knowingly cause to be delivered by mail, a certain letter dated June 22, 1935, addressed to Mr. Robert Forgan, Assistant Vice-President, National City Bank, New York City, N. Y., from the First National Bank of Omaha, Omaha, Nebraska, which letter was signed by C. D. Saunders, Vice-President, and referred to the enclosure of a draft for $100,000, and which letter was then and there enclosed in an envelope with postage paid thereon, and addressed as aforesaid."

Count 5 likewise realleged the scheme to defraud and stated that the defendant, for the purpose of executing it, "did unlawfully, wilfully and knowingly place and cause to be placed in an authorized depository for mail matter, to wit, a Post Office in the Borough of Manhattan, City of New York, to be sent and delivered by the Post Office Establishment of the United States, a certain writing, to wit, a letter, dated June 24, 1935, enclosed in a postpaid envelope addressed to Mr. Willard D. Hosford, John Deere Plow Company, Omaha, Nebraska, signed by Robert Forgar, Assistant Vice-President, which letter referred to the enclosure of a cashier's check for $100,000."

The scheme set forth in the indictment consisted of a plan to obtain money from a class of persons which included Leon D. Rothschild, Willard D. Hosford, and Robert Lewis, through false representations by the defendant that he was the agent of an important syndicate consisting of wealthy persons and that he was interested in purchasing for the syndicate properties belonging to members of the foregoing class. It was alleged that the defendant represented it to be impossible for the sellers to communicate with him at any particular place seeing that he was continually travelling, but he would always communicate with them. It was further alleged that he would pretend to the victims that it would be necessary to make preliminary investigations and upon completion thereof would inform them whether his syndicate would be interested in purchasing their properties.

It was further alleged that the defendant would then pretend to the victims that the preliminary investigations had been made, that the properties were satisfactory, and that he was ready to close the negotiations for the purchases, but that for income tax purposes it would be necessary to conceal the actual prices and insert fictitious prices in the contracts of purchase which would be substantially higher than the real prices, and that at the time of closing the deals he would deliver to the victims checks for the amount of the fictitious prices and they would return to him in cash the difference between the fictitious and actual prices.

It was further alleged that the defendant, as part of the fraudulent scheme, would represent that the transactions would be closed in various parts of the United States, Canada, and Mexico, and would agree to accompany the victims to such places. He would exhibit checks for the fictitious prices to the victims prior to the time of closing, but would not then deliver them, and would induce the victims to pay him the difference between such prices and the real prices in cash and would promise them to keep the fictitious checks as well as the difference they had paid until the particular deal was closed. During the course of the trips to close the various deals, he would represent to his victims

that he would have to stop over at various places to interview members of his syndicate or to close other transactions, and would induce them to travel to the points of destination alone, upon the promise that he would shortly follow. He would thereupon fail to return, retaining the cash he had received from the victims and converting it to his own use.

The government offered proof that Rothschild, Lewis, and Hosford, who are named in the indictment as victims of the scheme to defraud, caused advertisements to be inserted in the New York Times in order to secure purchasers for their properties. The defendant replied to the advertisements of Rothschild and Hosford by telegraph, and to the advertisement of Lewis by a typewritten letter which was delivered to the Times by hand and forwarded by it to him at Rochester by mail as per his previous instructions. There was proof that the defendant represented to the victims that he was the financial secretary of a syndicate that had millions of dollars to invest; that its purchases were always for cash; that he was in religion a Mennonite, had many influential friends, and had closed deals with various persons of large wealth. There was also proof that, as the indictment alleged, he contracted for his purchases at fictitious prices; that after favorable reports had been made by the engineers of the syndicate as to the properties for sale and prices had been agreed upon, he exhibited cashier's drafts for the fictitious prices to his victims and required them to put up the difference between those prices and the real ones and insisted upon closing the deals at points outside the United States. There was likewise proof that while en route for the destinations at which the deals were to be closed, the defendant disappeared with the money which the victims had left with him representing the difference between the fictitious and the real prices. By means of the foregoing fraudulent representations, the defendant secured $50,000 belonging to Rothschild; $100,000 belonging to Hosford, and $100,000 belonging to Lewis, and converted the same to his own use. The Rothschild transaction did not involve the use of the mails, and proof of it was only admitted to show that the defendant had devised a fraudulent scheme. Weisman, so far as possible, abstained from using the mails in connection with his fraudulent transactions. In spite of general efforts on his part to avoid the use of the mails, they undoubtedly were used for the purpose of executing the schemes to defraud both Lewis and Hosford. The principal question before us is whether there was sufficient evidence to justify the jury in finding that Weisman "caused" the mails to be used in his schemes to defraud and thus in convicting him under counts 1, 4, and 5 of the indictment.

The letter referred to in count 1 was in response to the advertisement by Lewis in the New York Times. It was dictated by Weisman to Bell who, under Weisman's instructions, had it typewritten by a public stenographer, signed it, directed it to box number "X 2528 Times Annex" (the direction provided for in the advertisement), and took it to the Times office. Lewis had left instructions with the Times to mail replies to his advertisement to his home in Rochester, but these instructions, as well as the identity of Lewis, were unknown to Weisman when he had the letter prepared. The Times forwarded by mail to Lewis at Rochester this letter signed by Bell, as well as another one which had been prepared and delivered to the Times by hand in the same way as the first. Each of the two letters stated in substance that, "We are principals and interested," and gave a telephone number. These letters were steps taken in the execution of the scheme to defraud Lewis which resulted in the conversion of $100,000 received from him.

■■ Judge Mack, who conducted the trial, charged the jury that if it believed that Weisman sent the communication which we have mentioned to the New York Times, and that the Times, "without instructions to the contrary, and in its ordinary course of business, * * * sent it on by mail to Lewis, * * * he thereby caused the United States mails to be used." We can feel no doubt that the charge was justified by the evidence and that the conviction under count 1 should stand. Section 215 of the Criminal Code (18 U.S.C.A. § 338) provides that: "Whoever, having devised * * * any scheme or artifice to defraud * * * shall, for the purpose of executing such scheme or artifice or attempting so to do, place, or cause to be placed, any letter, * * * package, writing * * * in any post office, * * * to be sent or

delivered by the post office establishment of the United States," shall be punished as prescribed in the act.

When Weisman had a letter delivered to the Times office in New York, there was every chance that the Times would forward it to its customer by mail. It has long been settled that a defendant may cause a letter to be sent or delivered by mail though such a mode of transmission was neither known nor intended, provided mailing or delivery by post might reasonably have been foreseen. United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836; Smith v. United States, 61 F.(2d) 681, 684 (C.C.A.5); Silkworth v. United States, 10 F.(2d) 711, 719 (C.C.A. 2), certiorari denied 271 U.S. 664, 46 S. Ct. 475, 70 L.Ed. 1139; Shea v. United States, 251 F. 440, 447 (C.C.A.6); Spear v. United States (C.C.A.) 246 F. 250; Demolli v. United States (C.C.A.) 144 F. 363, 6 L.R.A.(N.S.) 424, 7 Ann.Cas. 121.

The letter referred to in count 4 was connected with the defrauding of Hosford, who was executor of the estate of one McShane, who owned 90 per cent. of the stock of McShane Lumber Company, which in turn held all the stock of an Arizona company that owned 525,000 acres of certain timberlands in Mexico. One Johnson, acting on behalf of Hosford, had inserted an advertisement in the New York Times for the sale of these lands. This advertisement was answered by the defendant, who telegraphed that he was interested in purchasing them. Then followed telephones and interviews between Weisman (acting under an assumed name) and Johnson, his uncle McKinney, and Hosford, which finally resulted in a proposal by Weisman to pay $500,000 for the property. The selling price was to be increased to $600,000 in accordance with Weisman's usual plan of employing a price larger than the real one. Hosford was to put up $100,000 in order to bind the bargain on his side, which was to be returned to him at the time of closing. The proposed sale was abandoned because of Weisman's insistence that it should be closed in Mexico. But negotiations were soon renewed, and Weisman agreed with Hosford in New York that the title should be closed there on the terms originally proposed. It was arranged in June, 1935, that Hosford should return to his home in Omaha, Neb., prepare the papers, and send a representative to New York to complete the deal.

Weisman persuaded Hosford as part of the arrangement to agree to open a credit in his favor in New York. The latter returned to Omaha to have the papers prepared and forwarded. He did not send his agent to New York because the agent became ill, but the papers were sent there to McKinney, who acted as Hosford's agent. Among them was a cashier's check to Hosford indorsed by the latter to the defendant's order. This check was obtained by Hosford through the medium of his own bank in Omaha, which, at his request, mailed the letter (mentioned in the fourth count of the indictment) from its Vice President C. D. Saunders to Robert Forgan, assistant vice president of the National City Bank of New York. The letter contained a draft of the Omaha Bank in favor of the National City Bank for $100,000, and requested the latter to issue its draft payable to Hosford and to forward the same by air mail directed to Hosford in Omaha. In accordance with the remittance and request by the Omaha Bank, Robert Forgan issued the draft for $100,000 to the order of Hosford and forwarded it by air mail to the latter in Omaha. The letter containing this draft is the one mentioned in the fifth count of the indictment. Hosford received the draft of the National City Bank in Omaha and forwarded it with the title and other papers by express to McKinney. After the papers reached McKinney in New York, the defendant obtained possession of the draft from McKinney, cashed it at the bank, and on June 29, started with McKinney for Mexico, where it had finally been decided to close title. The defendant left the train at San Antonio, Tex., and was not seen again, but sent telegrams declaring the deal off upon the excuse that the terms of sale had been given publicity. He, however, retained the $100,000 which he had received in cash.

Judge Mack charged as to the fourth and fifth counts as follows:

"If you believe that after the deal was once off, or partially off, he again told Hosford to establish $100,000 credit in New York, and if you believe pursuant to that Hosford again caused this time a $100,000 check, in the ordinary course of business of himself and the bank to be sent by mail to Omaha to the National City Bank of New York or Forgan, and if you believe that it was delivered in Manhattan, to the National City Bank or Forgan

here, then he caused the mails to be used in that respect.

"And if you believe that, as a further step in the carrying out of negotiations, Forgan for the Bank deposited in the United States mails in New York for delivery in Omaha, as per the letter of June 24th, acknowledged June 26th, the $100,000 check, then again I charge you as a matter of law he caused the mails so to be used." (Fols. 5891–5893.)

The court likewise granted a request of Mr. Dailey, for the government, to extend his charge as follows:

"Mr. Dailey: If your Honor please, with respect to the last three counts, I think your Honor inadvertently omitted to instruct the jury that if the defendant under the circumstances detailed by your Honor failed to instruct Hosford not to use the mails then he caused the letters to be mailed in the request to Hosford to establish the credit, unless he specifically instructed Hosford not to have the United States mails used.

"The Court: I intended to say that; if I didn't say it, you may regard it now as said. I accept the amendment offered by the District Attorney." (Fols. 5895, 5896.)

█ It is argued that the foregoing charge was erroneous because of the allegation in the fourth count that the defendant did "knowingly cause to be delivered by mail a certain letter dated June 22, addressed to Mr. Robert Forgan, Assistant Vice President, National City Bank * * * from the First National Bank of Omaha * * * signed by C. D. Saunders, Vice President, and referred to the enclosure of a draft for $100,000 * * *." It is said that the portion of section 215 of the Criminal Code that is applicable to that count requires that a defendant shall *"knowingly"* cause a letter to be delivered by mail and that there was no evidence that the defendant had any knowledge that Hosford would establish or was even likely to establish a credit for $100,000 through the use of the mails. But *"knowingly"* has not been construed as involving absolute knowledge or intent. It is sufficient if the use of the mails may fairly be foreseen by a defendant as a step in the execution of a scheme to defraud. Such is the effect of the ruling of the Court of Appeals of the Eighth Circuit in Spear v. United States, 246 F. 250. See, also, Smith v. United States, 61 F.(2d) 681, 684 (C.C.A.5); like-

wise the opinion of Van Devanter, J., in Demolli v. United States (C.C.A.) 144 F. 363, 6 L.R.A.(N.S.) 424, 7 Ann.Cas. 121, where the use of the mails to transmit obscene matter was involved. The word *"knowingly"* is only used in the portion of section 215 that relates to cases where a defendant shall cause a letter "to be delivered by mail." The clause containing that word was not introduced into the statute until 1909 (35 Stat. 1131), and, in our opinion, did no more than to require that the steps in the causal chain which resulted in delivery through the mails should have been knowingly set on foot. For example, if the mails were used under circumstances that could not reasonably be foreseen, if a letter had been mailed without authority which the defendant or his agent had placed in a desk with no intent to have it posted, the act of knowingly causing it to be delivered by mail would not have been performed. Under the test laid down by Van Devanter, J., in Demolli v. United States (C.C.A.) 144 F. 363, 366, 6 L.R.A.(N.S.) 424, 7 Ann.Cas. 121 (when discussing the statute (18 U.S.C.A. § 334) which denounces one who "shall knowingly deposit, or cause to be deposited, for mailing" an obscene letter), a defendant is guilty if "he intentionally does an act, the natural and probable consequence of which, as known at the time, is that the objectionable matter will be deposited in the mail. * * * In the line of causation his act is a proximate cause of the objectionable matter being put in the mail." We can see no difference between causing a letter to be placed in an authorized depository for mail matter or in *"knowingly"* causing it "to be delivered by mail." The first provision is the one under which counts 1 and 5 of the indictment were drawn, and the second is the one which covered count 4. In each case the knowledge required is at most that the steps taken to execute the fraudulent scheme may under the circumstances known to the defendant naturally and probably result in the use of the mails. It would indeed be unfortunate if a defendant who had committed such indubitable and gross frauds as Weisman, and had accomplished them through the agency of the mails, should escape upon the technicality that he did not have the use of the mails sufficiently in mind.

█ Doubtless the charge of Judge Mack went somewhat farther than the previous decisions because he took from the jury

the question whether, if it believed the story of the government's witnesses, it should find that the defendant had *caused* the mails to be used in the execution of a scheme to defraud, and instructed it that in such event the inference of causation would follow as 'a matter of law. But under the mail fraud statute the question as to the use of the mails is not one of intent to have the mails employed in the execution of the fraud, but of "causation." United States v. Kenofskey, 243 U.S. 440, 37 S.Ct. 438, 61 L.Ed. 836; Milwaukee, etc., Railway Co. v. Kellogg, 94 U.S. 469, 24 L.Ed. 256; Demolli v. United States (C.C.A.) 144 F. 363, 6 L.R.A.(N.S.) 424, 7 Ann.Cas. 121. We think there was sufficient proof of causation in the legal sense under all three counts and that the burden necessary to sustain a criminal conviction was sufficiently met. The testimony justified a finding that the defendant caused the acts of mailing because he took steps which he knew at the time might naturally and probably result in the use of the mails. He made no request to have the question whether the defendant caused the letters to be mailed submitted to the jury. If he desired the question of causation to be submitted to it, he should have called the attention of the trial court to this by making a specific objection on that ground and asking to have the jury pass on that question. As things stood, the judge might well have supposed that he was only claiming that proof of intent to mail or deliver, or of absolute knowledge of the mailing or delivery was necessary, which is not the law.

Appellant's contention that there was a variance between the indictment and the proof is wholly without merit. Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 79 L.Ed. 1314. The criticism of the cross-examination with Beaver and Debecker is equally unfounded. The cross-examination had a bearing upon his credibility as a witness, and the judge told the jury that the government could not introduce evidence to rebut the answers of the witness as to such collateral matters and was bound by them. Nor was any rebuttal attempted. Other alleged errors in the admission of evidence require no special discussion. The rulings of the trial court seem to have been correct, and we hold the judgment of conviction to have been fully justified.

Judgment affirmed.