## UNITED STATES v. EPSTEIN.
### No. 115.

Circuit Court of Appeals, Second Circuit.

March 26, 1946.

Writ of Certiorari Denied June 3, 1946.

See 66 S.Ct. 1350.

Hyman Grill, of New York City, for appellant.

Harold J. McAuley, Asst. U. S. Atty., of New York City (John F. X. McGohey, U. S. Atty., of New York City, on the brief), for appellee.

Before L. HAND, CLARK, and FRANK, Circuit Judges.

CLARK, Circuit Judge.

Defendant, Louis Epstein, was indicted with three others for using the mails to promote frauds in violation of the well-known statute, 18 U.S.C.A. § 338, making it an offense to cause a letter to be mailed for the purpose of executing a "scheme or artifice to defraud." Of the other defendants, Wilfred E. Cohen and Harry Sussman had pleaded guilty, the former becoming the key witness for the prosecution; while Sam Elkin was separately tried and found guilty, but died before sentence was imposed. Defendant Epstein waived trial by jury and, after trial, was found guilty by the court of five of the six counts of the indictment, the remaining count being dismissed on motion of the United States. He now appeals, contending that there was a failure of proof of the crime charged, that the letters relied on in the various counts to show use of the mails were mailed by Cohen in furtherance of a different scheme to defraud with which he had no connection, that the proof was insufficient to support the judgment, and that certain evidence was improperly admitted.

The indictment alleged in detail a scheme of deception participated in by the defendants over a period from January, 1942, to December, 1943, by means of which Cohen obtained extensive sums of money through the discounting of notes by factors and others upon the strength of a false showing of himself as the owner of a successful business actively engaged in the production of motion picture machines. This scheme was carried out through (1) execution of promissory notes by Epstein and Sussman to Cohen and his concern, Spotlight Productions, Inc., together with estoppel certificates or conditional bills of sale—all falsely representing that the makers had given the notes in payment of machines purchased from Spotlight; (2) similar oral misrepresentations to the various factors who discounted the notes; (3) further false representations for like purpose that Cohen and Spotlight had contracts for the sale of machines to the Treasury Department of the United States Government; and (4) extensive check-kiting activities on the part of Cohen and Sussman, aided by Epstein, to obtain funds for payments on the notes and other needs. Proof for the prosecution came in detail from Cohen, supplemented by testimony from the various factors or money lenders and a bank officer, together with documentary evidence and the analysis of a government accountant. The defendant offered no evidence, but rested on the case for the prosecution.

The evidence as unfolded by Cohen showed an amazing scheme of deceit whereby he was able to deal in fantastic sums of money for many months on something less than the proverbial shoestring. He had served a prison term for forgery beginning in 1928, and thereafter was an interior decorator for over ten years, until that business "petered out" in the latter part of 1942. But in November, 1940, he organized Spotlight as a corporation for the manufacture of motion picture projectors. The corporation did make some sales in 1941; but by November, 1941, it had a loss of approximately $50,000, and thereafter had no income at all. Meanwhile he had been borrowing

money from Sussman—and through the latter from Epstein—at the exorbitant rate of 1% per day or by giving promissory notes at the rate of $8,000 in notes for $5,000 in cash. Then, needing more money and at cheaper rates, and through the offices of Sussman, he met Epstein personally; and soon the three were embarked upon the scheme of deception which is the basis for the charges here.

In detail, the scheme called for defendant Epstein to make promissory notes to Sussman, which were then to be endorsed to Cohen and by the latter discounted with various factors throughout the city. To induce such discounting, Cohen was to represent that the notes were received for the purchase price of machines bought from Spotlight by Epstein and Sussman, who agreed to corroborate the story if questioned and to execute the notes and supporting documents, receiving, in turn, a consideration of $400 for each $10,000 of notes issued. Epstein and Sussman then signed the notes, together with fictitious purchase orders and "estoppel" certificates stating that the notes were given "for value received" and were without defenses. There was also planned some form of security device, Epstein first expressing a preference for a chattel mortgage; but the form finally used was that of a conditional bill of sale evidencing the fictitious transaction and showing an apparent retention of title for security purposes. When two of the notes were about to mature in May, 1942, it was agreed that they might be paid off through the issuance of a series of similar notes. Thus was established the pattern of the Epstein-Sussman notes, issued in ever increasing amounts during the period alleged in the indictment, with conditional bills of sale until September, 1942, and thereafter without even that support.

The funds obtained by the discounting of notes were not in themselves sufficient for Cohen's purposes; and so he created a supply of cash and short-term credit through an extensive program of check-kiting, making use of several accounts for the rapid interchange of checks among them. In May, 1942, defendant Epstein made possible the continuation of this process by selling Cohen the use of the checking account of the New Union Square Hotel Corporation—a corporation owned by Epstein—and transferring to him a quantity of checks signed in blank, all for a fee of $50 for each $5,000 worth of checks.

Later Epstein complained of the inadequacy of the fee; and by a new arrangement he was paid a salary of $100 a week, which on his demand was increased to $150 per week. By the time of the final debacle of Cohen's financial pyramid in the fall of 1943, Epstein had collected some $24,000 in fees and commissions. Then, even when Cohen told Epstein he could not pay maturing Epstein-Sussman notes, Epstein still did not abandon his confederate; for in October, 1943, he made Cohen two direct loans totaling $17,000, at the usual rate of $8,000 for $5,000, which were never paid.

When Cohen was arrested on December 9, 1943, he had issued worthless checks to such an extent that 4½ million dollars' worth had been cashed by Sussman alone and $310,915 had been drawn on appellant's hotel corporation account, though it had rarely contained enough money to cover all checks outstanding against it. Appellant had signed or endorsed approximately $700,000 worth of notes, of which the sum of $127,790 remained unpaid. And various money lenders had lost substantial sums; the two largest losses were those of Accurate Factors of $95,000, and of Lectern Service of $85,000.

The substantial question on this appeal is presented by appellant's second claim of error to the effect that the "count letters" were used by Cohen to further an entirely different scheme of fraud with which appellant was not connected. And the issue is presented because the letters set forth in the indictment did not concern the Epstein-Sussman notes directly, but rather an additional device of deception, developed by Cohen to meet exigencies which faced him as matters later progressed. In October, 1942, when he had become indebted to Lectern Service to the extent of $25,000, the latter objected to the type of paper he was depositing and refused him further loans. To meet this crisis he resorted to a form of forged security suggested to him by Elkin, Lectern's general manager, who had recently joined his projects. This was nothing less than a showing of accounts due or to become due, not from Epstein or Sussman, but from the United States Treasury Department for the purchase of projectors from Spotlight for use in the Treasury's War Bond drives.

To present an appearance of completely official regularity, Cohen procured official Treasury stationery and franked envelopes, with which, under the stimulus of

his lively imagination, he showed purchases, orders, and confirmations of such orders from a fictitious Treasury official. In addition, he informed the factors that the Treasury Department was to make payment through the American Railway Express Company upon delivery of the machines to the company by Spotlight; and he displayed for their benefit Express Company checks supposedly in payment of similar orders, though actually procured by him by sending faked packages by express and depositing the necessary cash to cover the checks. The letters set forth in the indictment were the forged orders or confirmations of orders from the fictitious Treasury official actually mailed in franked envelopes by Cohen. They were addressed to Spotlight at the business addresses of the factors upon the latters' demand for confirmation of the accounts direct from the Treasury.

With this array of evidence Cohen was successful in inducing the factors to accept assignments of these apparently gilt-edge accounts as security for their loans and discounts. Thus he was able to continue his financial wizardry for several months more; and when he went down, the loss of one of the factors, Accurate, was $92,000 upon these purported Treasury assignments out of the total loss of $95,000 stated above.

While it seems most unlikely, in view of their relations, that Epstein did not know of this particular scheme, yet Cohen denied ever mentioning it to him and the record is without proof of any knowledge on his part. The District Court held that Epstein had clothed his partner with authority to misrepresent to the lenders "whatever his sinister ingenuity might suggest so long as it bore upon the single purpose of attributing to Spotlight a fictitious volume of business and a source of revenue," and that the particular means chosen was a mere incident of the scheme as a whole. The legal principle here involved was stated in United States v. Cohen, 2 Cir., 145 F.2d 82, 90, certiorari denied Cohen v. United States, 323 U.S. 799, 65 S. Ct. 553, where it was said that, while the prosecution must satisfy the jury as to each of the counts "that the transaction, in furtherance of which the 'count letter' was mailed, was part of a 'scheme' in which the particular accused was implicated, it was not necessary to show that he had any part in the immediate transaction. It was

enough, if the transaction was itself within the general scope of a 'scheme' on which all had embarked; those not immediately concerned in any particular fraud, would none the less be liable, so long as that fraud was within the kind on which all had agreed." United States v. Weisman, 2 Cir., 83 F.2d 470, 107 A.L.R. 293, certiorari denied Weisman v. United States, 299 U.S. 560, 57 S.Ct. 22, 81 L.Ed. 412, is to the same effect.

Here the use of the purported Treasury assignments was all a part of Cohen's general scheme, so far at least as he was concerned; for the proceeds thus obtained went to redeem Epstein-Sussman notes from both the important factors here involved, and the checks kited through Epstein's help assisted in making this device work. The only question is whether this fraud might be found by the trier of facts to be "within the kind" on which Epstein had agreed. We think the inference was justified upon all the evidence.

As in the case of the notes to which Epstein was undisputedly a party, this fraud was to be accomplished through the use of sham documents representing sales by Cohen to a reliable debtor. Far from being entirely unrelated, the notes, estoppels, and bills of sale signed by Epstein were the initial credit-securing devices which established Cohen's relationship with the factors and in a sense paved the way for his later representations of the Treasury Department as a customer. The basic similarity and interrelationship of the devices was therefore such as to point to the Treasury scheme as well within the type of fraud contemplated by appellant.

But beyond this was the further important fact that appellant had explicitly agreed to undertake or assist in frauds of a most extensive nature, which varied and expanded as Cohen's needs determined. Thus while he had originally wished to use the security device of the chattel mortgage, he deferred to Cohen's request for the conditional sale as giving the latter greater freedom in appearing to dispose of the machines. When the factors objected to the wording of the estoppel certificates, he dutifully signed more extensive ones in the form proposed by the factors' counsel. He sold the use of his checking account for the purpose of check-kiting without limiting the use of the checks in any way, even though he was bound to

know that thus they might defraud persons unknown to him. At the very time when the Treasury scheme was initiated he had been called upon for notes in unusually high amounts and had listened to Cohen's complaints of the exorbitant commissions required to procure credit from others. And yet, even with this implicit warning of crisis, he willingly supplied the means whereby Cohen prolonged the deception, and continued to do so to the end without restriction or apparent concern as to the uses to which these means might be put. His interconnection with Cohen-Spotlight affairs, as well as his recklessness in using that connection for his own ends, is also shown by the fact that as late as July, 1943, after arranging with Cohen for the necessary corroboration, he made affidavit to his Local Draft Board for selective service exemption as an employee of Spotlight engaged in the essential industry of manufacturing moving pictures and films "for Civilian and National Defense." And he knew—what, indeed, was most natural for so extensive a scheme—that the mails were to be used in its execution, for in January, 1942, he had promised Cohen to sign and send through the mails to one of the factors the estoppel statement which the latter required.

This evidence thus furnishes an adequate background for the inference that appellant was more interested in the advancement of the scheme and in securing the direct monetary returns which were to accrue to him than in the particular techniques used to carry it forward at any one time. He was too acquiescent in changes and developments, and too eager to turn the appearances of things to his own personal advantage, to make any nicety in choice of means of execution seem at all reasonable or natural. The district judge was therefore justified in finding that this particular fraud was within the kind or of the type agreed upon and intended by this appellant as well as by the others.

Appellant's other objections may be disposed of more briefly. He claims a variance between charge and proof, objecting vigorously that there was no evidence of representations by him that Cohen had a "successful business" and no showing that the business was in fact unsuccessful. There are two answers to these contentions: First, the indictment sets forth in detail the particular frauds discussed above; and the reference to Cohen's business is in effect a generalization of these particulars. These give the appellant the fair notice he is entitled to of the case he must meet, and the over-all generalization does not destroy the effect of the facts particularly pleaded. United States v. Groopman, 2 Cir., 147 F.2d 782, 785, and cases cited, certiorari denied Groopman v. United States, 66 S.Ct. 29. Second, the evidence did not fail to support the indictment. The fraudulent documents signed by appellant were a representation of successful sales and deliveries more persuasive than even general statements or fabricated balance sheets might have been. The myth of Cohen's success in business was supported by appellant's action in allowing Cohen complete freedom in the use of the hotel checking account. True, appellant also asserts that the business was not shown to be unsuccessful, relying especially upon Cohen's testimony that Spotlight originally had some 300 projectors built or partially built, of apparently substantial value. But other facts showed that Spotlight was not successful. What became of the machines is not shown; but it does appear that the corporation had a large indebtedness at the inception of the plan and had no income thereafter. Both as to the representations of Spotlight's success and its failure in fact, there was at least the "substantial similarity" between indictment and proof required by the cases. Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314; United States v. Rosenberg, 2 Cir., 150 F.2d 788, certiorari denied Rosenberg v. United States, 66 S.Ct. 90; United States v. Wilson, 2 Cir., 154 F.2d 802.

The objection of a lack of evidence to convict must obviously fail; the recital of the facts shows overwhelmingly appellant's direct participation in false and fraudulent instruments intended and used to defraud. The objection to the admission of evidence is directed to the testimony involving appellant's affidavit to his draft board and his arrangements concerning it with Cohen, on the ground that it merely went to show a collateral crime and was therefore only prejudicial. But, as we have shown above by our reference to it, we think this is a relevant part of the Cohen-Epstein story, entitled to consideration in the total picture. That incidentally it may have tended to show another crime does not render it inadmissible. Moore v. United

States, 150 U.S. 57, 61, 14 S.Ct. 26, 37 L. Ed. 996; 1 Wigmore on Evidence, 3d Ed. 1940, § 216.

Affirmed.

FRANK, Circuit Judge, concurs in the result.