**UNITED STATES of America,
Appellee,**

v.

**Michael J. SCANDIFIA, Appellant.**

**No. 246, Docket 31705.**

United States Court of Appeals
Second Circuit.

Argued Jan. 5, 1968.

Decided Jan. 31, 1968.

Elkan Abramowitz, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty., Michael S. Fawer, Asst. U. S. Atty., of counsel), for appellee.

H. Elliot Wales, New York City (Abraham H. Brodsky, New York City, of counsel), for appellant.

Before MOORE, FRIENDLY and KAUFMAN, Circuit Judges.

IRVING R. KAUFMAN, Circuit Judge:

The question presented on this appeal is whether the defendant Michael J. Scandifia "wilfully caused" the interstate transportation of counterfeit securities in violation of Title 18, United States Code, Sections 2314 and 2.[1]

The indictment, filed on September 30, 1965, was in 11 counts, each of which charged that on a specific day, between

1. 18 U.S.C. § 2314 provides:

    \*     \*     \*     \*     \*

Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered, or counterfeited;

    \*     \*     \*     \*     \*

Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

18 U.S.C. § 2 provides:

    (a) Whoever commits an offense against the United States, or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.

    (b) Whoever willfully causes an act to be done, which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

November 11, 1960 and November 30 of that year, Scandifia caused the interstate transportation of counterfeit Shell Union Oil Corporation bonds between New York City and Monmouth County, New Jersey. Following a mistrial because the jury was unable to reach a verdict, a second trial was held before Judge Tenney and a jury. Scandifia was found guilty of 9 counts—2 counts having been severed at the government's request before the first trial—and was sentenced to concurrent terms of 6 years' imprisonment on each count. For the reasons set forth below, we affirm.

In order to keep in focus the major question on appeal, we will first describe Scandifia's scheme as the jury might have found it viewing the facts and the inferences to be drawn therefrom in the light most favorable to the government, United States v. Edwards, 366 F.2d 853 (2d Cir. 1966), cert. denied, sub nom. Jakob v. United States, 386 U.S. 908, 87 S.Ct. 852, 17 L.Ed.2d 782 (1967); United States v. Kahaner, 317 F.2d 459 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 73, 11 L.Ed.2d 65 (1963); and then detail the facts relating to the individual counts.

Despite the sparse briefs and appendices, we glean from the record that a number of people who had invested in the Hersch Trading Company (company) were pressing to be repaid. One Morton Rosenberg, who seemed to be one of those principally responsible for financial matters, explained to Leon Hersch and Irving Cohen, his partners in the company, that he had no funds at the present time because he had invested sums of money in a Brooklyn garage owned by Scandifia. Hersch was determined to verify Rosenberg's tale and, accordingly, telephoned Scandifia, who put the lie to Rosenberg and denied flatly that the latter had invested in the garage. In any event, we discover that some time later, Hersch—with the consent of the company's investors—entered into an agreement with Scandifia for the latter's aid in collecting what Rosenberg owed. For his services, Scandifia was to receive 10 per cent of

the total amount due and was given a deposit of 1 per cent in advance. His inability to collect the debts did not exhaust his resourcefulness or deter him from turning this failure into a venture in his own behalf. Despite the news that even he could not get blood from a stone, he presented an appealing plan whereby the investors could obtain ready cash while he continued to pressure Rosenberg. And so, at a meeting at Hersch's New Jersey home in the latter part of October 1960—attended by Cohen and Jerome Lasky, Leonard Ledwitz and Sam Serkin, 3 of several investors—Scandifia exhibited to the group what purported to be legitimate Shell Union Oil bonds. He refused to explain how he had secured them, but he did state that the purpose of the display was to assure all concerned that ultimately they would recover the monies Rosenberg owed. Indeed, he added that if the investors wanted to make more money, this was an opportunity, and explained how they could reap profits by negotiating loans with bonds as collateral.

With the hook thus baited, in early November 1960, Hersch and Scandifia met in a New York City restaurant where Scandifia explained the full details of his plan. He envisaged the investors obtaining short term loans on Scandifia's Shell Union Oil bonds. They could retain any amount they were able to borrow in excess of 60 per cent of the face value of the bonds, but 60 per cent of face value was to be returned to Scandifia as his share. Scandifia went on to explain that when he succeeded in collecting the monies owed by Rosenberg, the short term loans would be paid off. In the interim, all concerned would have had the use of large sums of money even though Rosenberg's debt was uncollected.

Scandifia failed, however, to tell Hersch that the bonds were counterfeit. But Hersch was skeptical about their validity, and arranged to have them examined at a bank in the vicinity. The bank, failing to detect the counterfeit, informed Hersch that they were acceptable as collateral for a loan. Hersch's

concern thus alleviated, he agreed to co-operate in the execution of Scandifia's plan.

Accordingly, counterfeit bonds, having a face value of $410,000, were pledged at various unsuspecting banks in New York and New Jersey during November 1960. Scandifia received over $168,000 as his share of the loans before it was discovered that the bonds were counterfeit.

The circumstances under which the bonds were transported between New York and New Jersey vary. Accordingly, they will be described separately.[2]

*The Aaron Starr Transaction—Count Three.* The first loan was successfully negotiated at a Brooklyn bank on November 9, 1960 to the delight of all concerned. On November 12, Scandifia gave Hersch 30 bonds for Aaron Starr, one of the investors who lived in Freehold, New Jersey. Hersch, who also lived in New Jersey, drove out to Starr's home to show him the bonds and to explain the plan. Starr found the plan acceptable and on November 14 the two men drove to New York City where Starr obtained a loan from a local bank by pledging the 30 bonds. The bonds were in the trunk of the car during the trip from New Jersey to New York. Count three charged Scandifia with having caused the transportation of these bonds to New York.

*Leonard Ledvitz Transactions— Counts Two, Four, Nine and Eleven.* Hersch gave Scandifia his share of the Starr loan, and received in return 20 bonds for Ledwitz, who lived in New Jersey. Scandifia had met Ledwitz at a previous conference in Hersch's home. On November 14, Hersch took these bonds from New York City to Ledwitz' home (count two) and 2 days later Hersch and Ledwitz returned to New York with the bonds at which time Ledwitz negotiated

a loan (count four).[3] Several days later, Ledwitz asked Hersch for more bonds. Hersch relayed the request to Scandifia, who gave him 30 additional bonds. Once again Hersch took them to New Jersey (count nine), but Ledwitz never made use of them.

The various parties had arranged to meet at Hersch's New Jersey home on November 30. Prior to the meeting, however, Ledwitz told Hersch that his bank claimed that the bonds were counterfeit. Acting under instructions from Scandifia, Hersch advised Ledwitz to bring his remaining bonds to the meeting. At this gathering Ledwitz insisted that he wanted his money back; Scandifia assured him he would have it within a day or two. Ledwitz then returned the bonds to Scandifia who left with them, stating that he was going to New York to make arrangements for the return of the money (count eleven).

*The Solomon Rabstein Transactions— Counts Five, Six, Seven and Ten.* Sometime earlier, Hersch had spoken to another investor who had been at the first meeting at Hersch's home, one Sam Serkin, who agreed to obtain a loan on 50 bonds. Following the familiar pattern, Scandifia gave Hersch the bonds and Hersch took them to Serkin at his New Jersey office. On November 21, Serkin attempted to pledge the bonds, but was unable to negotiate a loan on satisfactory terms. He then suggested that the bonds be turned over to Solomon Rabstein, a creditor of his who might be able to arrange better terms.[4] Hersch agreed, but Rabstein insisted on having the bonds examined in New York at the Irving Trust Company, the trust agent for Shell Union Oil bonds. On November 23, he and Hersch took the bonds to New York (count five); the bank failed to detect that the bonds were counterfeit. Hersch

---

2. Those transactions that were not the basis of Scandifia's conviction will be discussed.

3. The indictment appears to have taken November 13 as the date of the second count. Scandifia does not claim to have been prejudiced by the variance.

4. Scandifia claims that Rabstein was a total stranger to him. But both Rabstein and Scandifia testified to being present at a meeting at Scandifia's garage which, as we read the record, took place prior to the Rabstein loan.

and Rabstein then returned to New Jersey where Rabstein negotiated a loan (count six). Later that evening, Hersch telephoned Scandifia in Brooklyn and told him that since nighttime was approaching he did not want to drive to Brooklyn (in order to deliver his share of the Rabstein loan). Scandifia agreed to come to New Jersey and a meeting was arranged at a restaurant close to South Amboy. On that occasion Scandifia received his share of the Rabstein loan and turned over 100 more bonds to Hersch.[5] On November 25, Hersch gave these bonds to Rabstein who, still dubious over dealings which seemed too good to be true, insisted that they go to New York to have the bonds examined again. The bonds were taken to New York (count seven), and this time the trip bore fruit for the counterfeit was discovered by the American Bank Note Company, the printer of the genuine Shell bonds.

Hersch promptly informed Scandifia of Rabstein's discovery and a meeting was arranged in Brooklyn. For obvious reasons, the discussion was heated. Rabstein threatened to go to the police if his money was not returned, and refused to release to Scandifia the bonds still in his possession. Scandifia, however, took them by force, but agreed to return his share of the Rabstein loan. Several hours later, Scandifia gave this money to Hersch, but told him not to give it to Rabstein until the bonds Rabstein had pledged were redeemed. On November 28, the bonds were redeemed and Hersch turned the money over to Rabstein. Hersch then telephoned Scandifia and was told "to come into New York and give him [Scandifia] the bonds"; he performed as instructed (count ten).

Other than the money thus returned to Rabstein, no part of Scandifia's share of the other loans negotiated through the use of the Shell bonds was ever recovered from him.

With these tortuous facts in mind, we turn to the points raised on this appeal.

Scandifia testified in his own defense and denied any participation in or knowledge of a scheme to obtain loans on Shell Union Oil bonds. Indeed, while he admitted acquaintance with the *dramatis personae*, he claimed never to have seen a bond or security certificate before the commencement of the instant proceedings. Thus, the basic factual issue before the jury was clear—did they believe Scandifia or the numerous government witnesses?

■■ The experienced and able trial judge instructed the jury that

The statutes which the indictment charges were violated by this defendant do not require proof by the government of knowledge on his part that the bonds were to be transported in interstate commerce. * * * .

If the defendant turned over bonds to Hersch or to some other person without limitation as to where they were to be transported, and if in fact thereafter the bonds were transported in interstate commerce, then the jury might properly find that the defendant caused their transportation in interstate commerce.

While counsel strenuously objects on appeal to this instruction, no objection was noted at the trial and no other instruction was requested. Under these circumstances, Scandifia may not now challenge these instructions. See Fed.Rules Crim. Proc. 30; Lopez v. United States, 373 U.S. 427, 436, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963). Cf. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965) (*en banc*), cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966). Nor does the doctrine of "plain error" save the day for Scandifia. Any alleged error in the charge did not seriously prejudice the defendant or affect the fairness or integrity of the trial so that a mistrial or miscarriage of justice would result unless we recognized that the trial judge had committed "plain error." See Fed. Rules Civ.Proc. 52(b); United States v.

---

5. For reasons unknown to us, Scandifia was not indicted for having himself transported these bonds in interstate commerce from New York to South Amboy.

Minieri, 303 F.2d 550 (2d Cir. 1962) cert. denied, 371 U.S. 847, 83 S.Ct. 79, 9 L.Ed.2d 81 (1962); United States v. Frascone, 299 F.2d 824 (2d Cir. 1962) cert. denied, 370 U.S. 910, 82 S.Ct. 1257, 8 L.Ed.2d 404 (1962); United States v. Sansone, 231 F.2d 887 (2d Cir.) cert. denied, 351 U.S. 987, 76 S.Ct. 1055, 100 L.Ed. 1500 (1956). We have already noted that Scandifia claimed that he never (1) gave Hersch or anyone else any bonds, (2) caused their interstate transportation, or (3) participated in any loan of the transaction involved in this case. The jury believed the government's witnesses and obviously found Scandifia's testimony incredible. Moreover, we cannot perceive any consideration of the evidence which could lead the jury to conclude that Scandifia gave the bonds to Hersch but did not "cause" their movement in interstate transportation, as the term is interpreted by the cases.

The question remains, however, whether there was sufficient evidence to support the jury's finding that Scandifia was the "cause" of the interstate transportation of the counterfeit securities. The basic difficulty encountered when considering causation is that "[t]o consequences no limit can be set." Hart & Honoré, Causation in the Law 64 (1959). Thus, "the consequences of the simplest act may be traced over an ever-widening canvass with the passage of time." Petition of Kinsman Transit Company, 388 F.2d 821 (2d Cir. 1968). Every enlightened system of jurisprudence, therefore, must have rules or guidelines to determine when a person will no longer be held responsible for a result "caused in fact" by his act or omission.

■ In the instant case, Scandifia clearly was a cause in fact of the counterfeit bonds entering the stream of interstate commerce; had he not provided Hersch and the investors with the Shell bonds, they would have transported them between New York and New Jersey. It is also true that Scandifia is not insulated from criminal responsibility merely because the result which the law condemns was achieved through the actions of in-nocent intermediaries. See, e. g., United States v. Giles, 300 U.S. 41, 57 S.Ct. 340, 81 L.Ed. 493 (1937); United States v. Weisman, 83 F.2d 470, 107 A.L.R. 293 (2d Cir.) cert. denied, 299 U.S. 560, 57 S.Ct. 22, 81 L.Ed. 412 (1936). See also Hart & Honoré, supra, Ch. XIII.

The government argues, however, that the evidence was sufficient to support the conviction because it establishes that Scandifia gave the bonds to Hersch "without any limitation as to where he [Hersch] could take them to have the loans negotiated," and that the bonds were thereafter transported in interstate commerce. We would hesitate to endorse the principle that a causal relationship could be found here merely because the interstate transportation was not in any way inconsistent with Scandifia's instructions and redounded to his benefit. In the absence of some evidence that Scandifia intended, knew, or could have reasonably foreseen that the innocent persons to whom he entrusted the bonds would take them across state lines, we question whether the jury would have been justified in concluding that he did more than provide others with the opportunity to do that which the law forbids. And, to provide an opportunity would not seem *ipso facto* to brand one as the causer. Compare Hart & Honoré, supra, 48–57. Moreover, the causer as a principal has been eliminated from 18 U.S.C. § 2314, and since the 1951 amendment, 18 U.S.C. § 2(b) has required that the defendant *wilfully* cause the forbidden act to be done.

■ In any event, we need not decide the question posed by the government, because we find that the interstate transportation in this case was a reasonably foreseeable consequence of Scandifia's actions. There can be no doubt that a defendant may be found to be a "cause" if the result which the law forbids was reasonably foreseeable. In United States v. Kenofskey, 243 U.S. 440, 443, 37 S.Ct. 438, 61 L.Ed. 836 (1917), the Supreme Court noted with respect to another statute posing causal difficulties that "cause" is used in its well-known sense of "bring-

250

ing about." We stated in United States v. Weisman, supra, 83 F.2d at 473, when presented with a comparable problem, that "[i]t has long been settled that a defendant may cause a letter to be sent or delivered by mail though such a mode of transmission was neither known nor intended, provided mailing or delivery by post might reasonably have been foreseen." Compare Wapnick v. United States, 355 F.2d 136 (2d Cir. 1966).

With these principles in mind, we affirm Scandifia's conviction. Scandifia knew that Hersch and those to whom Hersch was transferring the bonds often had occasion to be in New Jersey. Indeed, very early in the saga Scandifia met Hersch and Ledwitz at a New Jersey restaurant and again in late October he attended a meeting at Hersch's New Jersey home at which a number of the investors were present. It appears that it was at this meeting that he first broached the subject of using the bonds in order to secure loans. Moreover, as we have already noted, Scandifia personally delivered 100 bonds to Hersch in South Amboy, New Jersey, after the Rabstein loan was negotiated. We have little difficulty, therefore, in concluding that Scandifia could reasonably have foreseen that the Shell bonds would be taken across state lines.

In addition, as to count ten, the evidence disclosed that Scandifia told Hersch "to come into New York and give him the bonds," and, with respect to count eleven, that Scandifia left a meeting in New Jersey with the bonds in his possession and stated specifically that he was going to New York. There is little doubt that the jury could properly infer

that he actually went where he declared he intended to go.[6] It follows that Scandifia should reasonably have foreseen the interstate transportation charged in these 2 counts. Indeed, an inference of actual knowledge on his part would not be unreasonable. Under these circumstances, it hardly distorts the practical or fair meaning of the term to conclude that Scandifia was the "cause" of the transportation.

Having made this determination with respect to counts ten and eleven, we need not consider the causation question raised by the other counts, since the trial judge imposed concurrent sentences on all counts. See Lawn v. United States, 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); United States v. Romano, 382 U.S. 136, 86 S.Ct. 279, 15 L.Ed.2d 210 (1965); United States v. Gainey, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658 (1965); United States v. Gonzalez, 379 F.2d 284, 285 (2d Cir. 1967) (per curiam); United States v. Orza, 320 F.2d 574 (2d Cir. 1963).[7]

Only one other point raised by Scandifia merits discussion. During the cross-examination of Irving Cohen, defense counsel brought out that Cohen originally had told agents of the Federal Bureau of Investigation that he had obtained the counterfeit bonds from a "Mr. Schweikert." Cohen had testified that he had mentioned "Schweikert" under instructions from Scandifia and, on redirect, he explained that he had obeyed because "[m]y family had received threatening phone calls. * * * [and f]or fear of my family's life, knowing Mr. Scandifia's background." Since the purpose of the cross-examination was to

6. Scandifia insists that because the indictment charged only that he "caused" the transportation he cannot be found guilty for having transported the bonds himself. It seems specious to argue that one who brings about a result directly cannot be fairly said to have caused that result. In any event, Sandifia made no claim of prejudice resulting from the variance and we find no fatal variance.

7. Scandifia's culpability and participation in the illegal venture is clear and would

be unaffected by whether he was technically a "cause" of the interstate transportation as charged in each count. And, there is nothing in the record to suggest that Scandifia received a longer sentence because he was found guilty on 9 counts. See United States v. Bottone, 365 F.2d 389, 394 (2d Cir.), cert. denied, 385 U.S. 974, 87 S.Ct. 514, 17 L.Ed.2d 437 (1966).

impeach Cohen with a prior inconsistent statement, the trial judge acted well within his discretion in permitting the government to explain away the inconsistency. See 3 Wigmore, Evidence §§ 1044–46 (3d ed. 1940); McCormick, Evidence § 49 (1954). And if there was any prejudice to Scandifia in Cohen's answer, it was cured by the court's prompt instruction to the jury to disregard the reference to Scandifia's background.[8] See United States v. Murphy, 374 F.2d 651, 654 (2d Cir.), cert. denied, 389 U.S. 836, 88 S.Ct. 47, 19 L.Ed.2d 98 (1967); United States v. Caruso, 358 F.2d 184, 186 (2d Cir.), cert. denied, 385 U.S. 862, 87 S.Ct. 116, 17 L.Ed.2d 88 (1966).

Affirmed.

---

8. Although Cohen referred to "my family" —and not himself—as having received the threats, the testimony was admissible nevertheless, because a statement offered to show its effect on the hearer is not hearsay. See, McCormick, Evidence, supra, § 228. Counsel did not seek an instruction limiting the purpose for which the testimony was admitted.